IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MUNICIPAL PARKING SERVICES, INC. | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00882-ADA |
| | ) | JURY DEMAND |
| PARKING REVENUE RECOVERY | ) | |
| SERVICES, INC., LAZ KARP ASSOCIATES, | ) | |
| LLC and LAZ PARKING TEXAS, LLC, | ) | |
| | ) | |
| *Defendants.* | | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Municipal Parking Services, Inc. ("MPS") brings this action against Defendant

Parking Revenue Recovery Services, Inc. ("PRRS"), and Defendants LAZ Karp Associates, LLC

and LAZ Parking Texas, LLC, and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement of U.S. Pat. No. 10,121,172 (Exhibit 1),

U.S. Pat. No. 11,257,302 (Exhibit 2), U.S. Pat. No. 11,688,205 (Exhibit 3), U.S. Patent No.

12,142,085 (Exhibit 4), and U.S. Patent No. 12,249,187 (Exhibit 5) (collectively, the "Patents-in-

Suit").

2.      Plaintiff MPS develops and sells innovative automated parking technology

platforms that are now deployed in parking facilities and on streets across North America. The

Patents-in-Suit were awarded to MPS to protect these revolutionary parking technology

platforms.

3.      Upon information and belief, Defendants are engaged in making, using, offering

for sale, selling, importing, or otherwise providing, within the United States and in particular the

State of Texas and this District, automated parking monitoring and management systems/services

and in so doing are infringing, directly or indirectly, claims of the Patents-in-Suit, and

Defendants continue to do so willfully and without authorization.

4.      MPS seeks to recover damages, attorney's fees, and costs arising from

Defendants' pre- and post-Complaint infringement of MPS's patented technology. MPS also

seeks an injunction against further infringement by Defendants.

## THE PARTIES

5.      Plaintiff MPS is a Minnesota corporation having a place of business at 11305

Four Points Dr., Building 2, Suite 300, Austin, Texas.

6.      MPS is the owner of the Patents-in-Suit.

7.      MPS develops, markets, and sells innovative parking solutions that are deployed

by cities, municipalities, and private parking facility operators.

8.      Upon information and belief, Defendant PRRS is a Colorado corporation with a

principal place of business located at 6025 S. Quebec St., Suite 350, Greenwood Village, CO.[1]

9.      Upon information and belief, PRRS also has and maintains regular and

established places of business in this District, including in the city of Austin, Texas.

10.     Upon information and belief, PRRS may be served with process by serving its

registered agent, Incorp Services, Inc., 815 Brazos Street, Ste. 500, Austin, Texas 78701.[2]

---

[1]https://www.sos.state.co.us/biz/BusinessEntityDetail.do?quitButtonDestination=BusinessEntity
Results&nameTyp=ENT&masterFileId=20051367126&entityId2=20051367126&fileId=200513
67126&srchTyp=ENTITY

[2] https://mycpa.cpa.state.tx.us/coa/coaSearchBtn (Texas Comptroller of Public Accounts
Franchise Tax Account search)

11.     Upon information and belief, Defendant LAZ Karp Associates, LLC is an entity organized under the laws of Connecticut with a principal place of business at 1 Financial Plaza, Floor 14, Hartford, Connecticut 06103.[3]

12.     Upon information and belief, LAZ Karp Associates, LLC also has and maintains a regular and established place of business in this District, including at 515 Congress Ave, Suite 2240, Austin, Texas.[4]

13.     Upon information and belief, LAZ Karp Associates, LLC may be served through its registered agent located at Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.[5]

14.     Upon information and belief Defendant LAZ Parking Texas, LLC is a limited liability company organized under the laws of Texas with a principal place of business at 1 Financial Plaza, Floor 14, Hartford, Connecticut.

15.     Upon information and belief, LAZ Parking Texas, LLC has and maintains a regular and established place of business in this District, including at 515 Congress Ave, Suite 2240, Austin, Texas.

16.     Upon information and belief, LAZ Parking Texas, LLC may be served through its registered agent located at Corporation Service Company, 211 East 7th Street, Suite 620, Austin,

---

[3] https://service.ct.gov/business/s/onlinebusinesssearch?businessNameEn=CaTRAeKxiYdK5JcXITGABE%2F%2BVli2uQXMDkQP%2FuT%2BqOk%3D&language=en_US

[4] https://www.lazparking.com/our-company/about/contact-us#ntx

[5] https://comptroller.texas.gov/taxes/franchise/account-status/search/12611647087 (Texas Comptroller of Public Accounts Franchise Tax Account search)

Texas 78701.[6]

17.     Upon information and belief, LAZ Parking Texas, LLC is wholly owned by, and/or acts as the agent of, and/or is dominated, controlled and directed by, and/or acts as a mere instrumentality of, LAZ Karp Associates, LLC. For example, LAZ Parking Texas, LLC lists a principal place of business located at the same address as LAZ Karp Associates, LLC (1 Financial Plaza, Floor 14, Hartford, Connecticut);[7] Alan Lazowski is listed as the CEO and Director of both LAZ Parking Texas and LAZ Karp Associates, LLC on the Texas Secretary of State website; and LAZ Parking's business website also lists Mr. Lazowski as Chairman and CEO of LAZ Parking. LAZ Karp Associates, LLC and LAZ Parking Texas, LLC are referred to collectively hereinafter as "LAZ Parking".

18.     Upon information and belief, LAZ Parking owns, controls, and/or operates parking lots throughout the United States and has contracted with PRRS for PRRS's  "ARC" automated parking monitoring and management systems/services at parking facilities LAZ Parking operates, including facilities in this District and specifically in Austin, Texas.

## JURISDICTION AND VENUE

19.     This action arises under the Patent Act, 35 U.S.C. § 271 et seq.

20.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

21.     Jurisdiction and venue for this action are proper in this District.

22.     As discussed in greater detail below, Defendants have individually and/or jointly, committed acts of patent infringement and/or induced and/or contributed to acts of patent

---

[6] https://mycpa.cpa.state.tx.us/coa/coaSearchBtn (Texas Comptroller of Public Accounts Franchise Tax Account search)

[7] https://service.ct.gov/business/s/onlinebusinesssearch?businessNameEn=8OlpzHEHTCfdR%2BtvToZu%2BXToWSFv0GEYjLuZpsnbNy0%3D

infringement by others in this District, the State of Texas, and elsewhere in the United States, and continue to do so willfully and without authorization by making, selling, using and/or inducing others to use or contributing to others' use of automated parking monitoring and management systems/services that infringe claims of the Patents-in-Suit and/or have no substantial non-infringing use.

23.    This Court has personal jurisdiction over Defendant PRRS at least because, through PRRS's own acts and/or through the acts of each other Defendant or customer acting as its agent, representative, or alter ego, PRRS (i) has a presence or regular and established place of business in the State of Texas and this District; (ii) has purposefully availed itself to the privileges of conducting business in the State of Texas and this District; (iii) has done and is doing substantial business in the State of Texas and this District, directly or through intermediaries, both generally and, on information and belief, with respect to the allegations in this Complaint, including committing (directly or indirectly) one or more acts of infringement in the State of Texas and this District; (iv) maintains continuous and systematic business contacts in the State of Texas and this District; and/or (v) provides automated parking monitoring and management systems/services alleged to be infringing in this Complaint, directly or through intermediaries, with awareness that such systems/services are likely destined for use, offer for sale, and/or use in the State of Texas and in this District.

24.    Upon information and belief, PRRS is registered to do business in Texas with the Texas Comptroller of Public Accounts.[8] Upon information and belief, PRRS may be served with process by serving its registered agent, Incorp Services, Inc., located in this District at 815

---

[8] https://mycpa.cpa.state.tx.us/coa/coaSearchBtn (Texas Comptroller of Public Accounts Franchise Tax Account search)

Brazos Street, Ste. 500, Austin, TX 78701.[9]

25.     Upon information and belief, PRRS does regularly and continuously do business in Texas and in this District.

26.     Upon information and belief, PRRS maintains regular and established places of business in this District, including in the cities of Austin, Texas and San Antonio, Texas.

27.     For example, upon information and belief PRRS installs and operates parking monitoring equipment at parking facilities in at least Austin, Texas and San Antonio, Texas and issues parking violation notices to individuals using such parking facilities. See, for example, Exhibit 17 (post titled "Prrs (parking revenue recovery services) scam", with message including "Parked in a LAZ lot and I got the dreaded notice of 'non' compliance" from "r/Austin" post); Exhibit 18 (PRRS "ticket" in San Antonio).

28.     For example, upon information and belief PRRS installs and operates parking monitoring equipment, including but not limited to permanently installed parking cameras, at fixed locations within parking facilities in Austin, Texas, including but not limited to facilities located at:

- 510 Guadalupe Street, Austin, Texas
- 108 W. Gibson, Austin, Texas
- 305 S. Congress Avenue, Austin, Texas
- 400 E 8th Street, Austin, Texas
- 415 E 7th Street, Austin, Texas
- 99 Trinity Street, Austin, Texas

29.     For example, John Conway, on information and belief PRRS's co-founder, has stated that that PRRS is "installing the system" at parking facilities of its customers. https://www.facebook.com/Parkingprrs/videos/768476596907647, at 1:00.

---

[9] https://mycpa.cpa.state.tx.us/coa/coaSearchBtn (Texas Comptroller of Public Accounts Franchise Tax Account search)

30.     Upon information and belief, PRRS also issues parking violation notices associated with the locations identified in paragraph 28.

31.     For example, PRRS issued a parking violation notice associated with 510 Guadalupe Street, Austin, Texas. Exhibit 6 ("Parking Notice" by PRRS for violation at parking facility located at 510 Guadalupe Street, Austin, Texas, on 4/27/2024).

32.     Upon information and belief, PRRS also maintains employees located in this District.

33.     For example, Indeed.com displays posts regarding "Working at Parking Revenue Recovery Services" from individuals identified as located in "San Antonio, TX," "El Paso, TX," and "Austin, TX".  https://www.indeed.com/cmp/Parking-Revenue-Recovery-Services/reviews.

34.     Upon information and belief, PRRS's employees located in this District conduct PRRS's business in person and at physical parking facilities in this District.

35.     Upon information and belief, PRRS employees perform activities central to PRRS's business at physical parking facilities of PRRS's customers in this District.

36.     At least in view of the foregoing and upon information and belief, the presence of PRRS's employees in this District is important to and connected to such employees' performance of their professional responsibilities and duties in this District, and to PRRS's business in this District.

37.     Upon information and belief, PRRS has also purposefully directed its activities at residents in this District by specifically advertising, promoting, offering for sale, selling and/or distributing and continues to advertise, promote, offer for sale, sell, and/or distribute its automated parking monitoring and management systems/services used to infringe the Patents-in-Suit to customers and potential customers in this District.

7

38.     For example, upon information and belief PRRS has provided and continues to willfully provide infringing automated parking monitoring and management systems/services at parking lots and/or facilities in this District, including via infringing use of its "Automated Recognition and Compliance System" ("ARC for short") at facilities in the city of Austin, Texas located at least at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street as explained above and further alleged below and in the attached Exhibits 11A through 15A, and PRRS has derived substantial revenues from such infringement occurring within Texas and this District.

39.     The patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities. As explained above and further in the specific allegations below, on information and belief a substantial part of the events giving rise to MPS's claims against PRRS have occurred in Texas and this District.

40.     Moreover, Plaintiff MPS is a competitor of PRRS.  MPS has an office and established place of business in the State of Texas and specifically in Austin, Texas in this District, and MPS's customers and potential customers reside in the State of Texas (including in this District). Therefore PRRS's infringing acts giving rise to this lawsuit and the harm MPS has suffered have both occurred in this District.

41.     Defendant PRRS has established sufficient minimum contacts with the State of Texas and this District such that PRRS should reasonably and fairly anticipate being brought into court in the State of Texas and this District without offending traditional notions of fair play and substantial justice.

42.     Venue is proper in this District as to PRRS under 28 U.S.C. §§ 1391(b) and 1400(b).

43.     Venue is proper as to PRRS because, on information and belief, PRRS has committed acts of infringement in this District, and PRRS also has a regular and established place of business in this District.

44.     Upon information and belief, as explained above and also as alleged further below and in attached Exhibits 11A through 15A, PRRS has committed and continues to commit acts of infringement in this District, by using (individually and/or jointly with LAZ Parking or other customers) and/or inducing others to use, or contributing to others' use of, automated parking monitoring and management systems/services, including PRRS's "ARC" system/services provided at parking facilities located in this District, including at facilities located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin, Texas.

45.     Upon information and belief, and also as explained above in paragraphs 26 through 43, PRRS also has a regular and established place of business in this District. Further, upon information and belief and also as explained in paragraphs 21 through 44 above, PRRS's business at its established locations in this District relate to the infringing use of PRRS' "ARC" automated parking monitoring and management systems/services.

46.     This Court has personal jurisdiction over LAZ Parking, at least because LAZ Parking (i) has a presence or regular and established place of business in the State of Texas and this District; (ii) has purposefully availed itself to the privileges of conducting business in the State of Texas and this District; (iii) has done and is doing substantial business in the State of Texas and this District, directly or through intermediaries, both generally and, on information and belief, with respect to the allegations in this Complaint, including committing (directly or indirectly) one or more acts of infringement in the State of Texas and this District; and/or (iv)

maintains continuous and systematic business contacts in the State of Texas and this District.

47.     Upon information and belief, LAZ Parking Texas LLC and LAZ Karp Associates, LLC are registered to do business in Texas with the Texas Comptroller of Public Accounts, and each of LAZ Parking Texas and LAZ Karp Associates, LLC may be served with process by serving its registered agent in Texas at Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.[10]

48.     Upon information and belief, LAZ Parking does regularly and continuously do business in Texas and in this District.

49.     Upon information and belief, LAZ Parking maintains regular and established places of business in this District and generates substantial revenues from its business activities in this District.

50.     For example, upon information and belief, LAZ Parking maintains a physical office and employees in this District, including at 515 Congress Ave., Suite 2240, Austin, TX. See, for example, https://www.lazparking.com/our-company/about/contact-us#ntx:

---

[10] https://mycpa.cpa.state.tx.us/coa/coaSearchBtn (Texas Comptroller of Public Accounts Franchise Tax Account search)



51.     Upon information and belief, Defendant LAZ Parking Texas LLC also owns 515 Congress Ave., Suite 2240, Austin, TX. Exhibit 8.

52.     Exhibit 8 is a true and correct copy of a property search record for 515 Congress Ave., Suite 2240, Austin, Texas, from the website record of the Travis Central Appraisal District of Travis County, Texas, available at https://travis.prodigycad.com/property-detail/769346/2025.

53.     As other examples, upon information and belief, LAZ Parking also maintains regular and established places of business at parking facilities in Texas and in this District that it operates, including monitoring and managing entry and exit to such parking facilities.

54.     LAZ Parking's website shows 58 different parking facilities available in Austin, Texas:



https://go.lazparking.com/search-results/Austin-Texas-US?start=2025-04-08T22%3A23%3A10.121Z&end=2025-04-09T00%3A23%3A10.121Z

55.    Upon information and belief, LAZ Parking also maintains ownership, management, and/or control over the parking facilities shown in the preceding paragraph, including but not limited to the means of entry and exit at such facilities.

56.    In addition, upon information and belief LAZ Parking has contracted with PRRS for PRRS to provide PRRS's automated parking monitoring and management systems/services, including PRRS's ARC system/services, at parking facilities owned, operated, managed, and/or controlled by LAZ Parking, including such facilities located in this District, the use of which systems/services infringes the Patents-in-Suit as alleged in this Complaint.

57.    Upon information and belief, LAZ Parking operates parking facilities located in Austin, Texas at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Ave, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin, Texas.

58.     Below are true and correct screen captures from LAZ Parking's website for

parking facilities operated by LAZ Parking located at 510 Guadalupe Street and 108 W. Gibson

in Austin, Texas:

| 510 Guadalupe, Austin, TX | 108 W. Gibson, Austin, TX |
|---|---|
|  | |
| https://go.lazparking.com/buynow?l=750&start=2025-04-08T22%3A46%3A23.310Z&end=2025-04-09T00%3A46%3A23.310Z | https://go.lazparking.com/buynow?l=138983&start=2025-06-06T16%3A30%3A30.938Z&end=2025-06-06T18%3A30%3A30.938Z |

59.     Upon information and belief, parking facilities where LAZ Parking has contracted

for the infringing use of PRRS's automated parking monitoring and management

systems/services include but are not limited to those located at 510 Guadalupe Street, 108 W.

Gibson, 305 S. Congress Ave, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin,

Texas.

60.     Exhibit 6 is a true and correct copy of a screen capture of a reddit.com post

regarding "Parking Notice" from "Parking Revenue Recovery Services, Inc," for a parking

facility identified as located at 510 Guadalupe Street, Austin, Texas, on 4/27/2024.

61.     Upon information and belief, LAZ Parking Texas LLC also owns 510 Guadalupe

Street, Austin, Texas. Exhibit 9.

62.     Exhibit 9 is a true and correct copy of a property search record for 510 Guadalupe

Street, Austin, Texas, from the website record of the Travis Central Appraisal District of Travis

County, Texas, available at https://travis.prodigycad.com/property-detail/848897/2025.

63.     LAZ Parking's website states that Alpha Park, which on information and belief was acquired by LAZ Parking in 2017, "contracts with PRRS to collect outstanding violation debts that are not paid in a timely fashion". https://www.lazparking.com/our-company/about/alpha-park/violation-notices.

64.     Upon information and belief, by knowingly contracting for and/or using PRRS's automated parking monitoring and management systems/services at parking facilities owned, operated, managed, and/or controlled by LAZ Parking in the State of Texas and this District, LAZ Parking has committed acts of infringement in the State of Texas and in this District, directly or indirectly, as explained above and further herein below.

65.     The patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities. As explained above and further in the specific allegations below, on information and belief a substantial part of the events giving rise to MPS's claims against LAZ Parking have occurred in the State of Texas and this District.

66.     LAZ Parking has established sufficient minimum contacts with the State of Texas and this District such that LAZ Parking should reasonably and fairly anticipate being brought into court in the State of Texas and this District without offending traditional notions of fair play and substantial justice.

67.     Venue is proper in this District as to LAZ Parking under 28 U.S.C. §§ 1391(b) and 1400(b).

68.     Venue is proper as to LAZ Parking because, on information and belief, LAZ Parking has committed acts of infringement in this District, and LAZ Parking also has a regular and established place of business in this district.

69.     Upon information and belief, as explained above and also as alleged further below and in attached Exhibits 11A through 15A, LAZ Parking has committed and continues to commit acts of infringement in this District, including by using and/or inducing others to use infringing automated parking monitoring and management systems/services, including PRRS's "ARC" systems/services, at parking facilities located in this District, including at facilities located in Austin, Texas at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue,  400 E 8th Street, 415 E 7th Street, and 99 Trinity Street.

70.     Upon information and belief, and as explained above in paragraphs 47 through 68, LAZ Parking also has regular and established places of business in this District. Further, upon information and belief and also as explained in paragraphs 44 through 69 above, LAZ Parking's business at its established locations in this District relate to the infringing use of PRRS' automated parking monitoring and management system/services.

## JOINDER

71.     MPS seeks the relief requested herein, including an injunction and appropriate damages, against PRRS itself based on PRRS's activities related to PRRS's provision of infringing automated parking management and monitoring systems/services activities to its customers, including but not limited to provision of such systems/services to PRRS customer LAZ Parking.

72.     As to the activities of LAZ Parking specifically, MPS seeks the relief requested herein against each of PRRS and LAZ Parking jointly, severally, or in the alternative, arising out of the same infringing use of the same PRRS system/services at LAZ Parking locations.

73.     Joinder of PRRS customer LAZ Parking to this action is proper under at least Federal Rule of Civil Procedure 20 and 35 U.S.C. § 299, at least because the infringing conduct

of each Defendant that is alleged by this Complaint arises out of the same transaction, occurrence, or series of transactions or occurrences, relating to using the same system(s)/service(s) to perform the same accused method, and questions of fact common to all Defendants will arise in this action.

74.     For example, upon information and belief, PRRS makes, uses, offers for sale, and/or sells automated parking monitoring and management systems/services for or to its customers including joined defendants LAZ Parking, and in doing so infringes claims of the Patents-in-Suit.

75.     Also, upon information and belief, LAZ Parking uses and/or induces others to use automated parking monitoring and management systems/services purchased and/or licensed from PRRS, and in doing so infringes, directly and/or indirectly, claims of the Patents-in-Suit. Upon information and belief, because PRRS's automated parking monitoring and management systems/services have been used and are in use at LAZ Parking facilities, and there are sales, licensing and/or technology agreements between LAZ Parking and PRRS.

76.     At least in view of the facts alleged in paragraphs 71 through 75 above and because infringement allegations as to each Defendant concern use of the same automated parking monitoring and management systems/services provided by PRRS, questions of fact common to all Defendants will arise in this action.

## BACKGROUND AND PATENTS-IN-SUIT

77.     Since its inception, Plaintiff MPS has become a pioneering force in the smart parking industry. As MPS has grown, it has expanded operations across the United States including in Austin, Texas.

78.    MPS provides municipalities and the public with smart parking technology to help keep cities and campuses safer:



https://municipalparkingservices.com/.

79.    MPS has successfully designed, developed and patented innovative technology that provides its customers with automated, cost-effective parking lot monitoring and management solutions.

80.    More specifically, MPS's patented technology includes automated processes and systems that capture the identity information of vehicles entering and exiting parking lots, calculate associated fees, and issue parking violation notices where appropriate.

81.    MPS's solutions allow automated maintenance of parking lots via sophisticated camera usage and cloud-based servers. An example is below:





82.    Customers of MPS's patented automated parking solutions include public municipalities and private parking facility operators.

83.    MPS has invested substantial resources to develop and patent its automated parking technology. As a result, MPS has been awarded various patents protecting its innovations, including the Patents-in-Suit.

84.    The Patents-in-Suit relate to, among other things, novel methods to monitor parking facilities and enforce violations.

85.    MPS is the owner of the entire right, title, and interest in and to U.S. Patent No. 10,121,172 ("the '172 patent"), which duly and legally issued on November 6, 2018. The '172 patent is entitled "Parking Lot Monitoring System." A copy of the '172 patent is attached as Exhibit 1.

86.    MPS is the owner of the entire right, title, and interest in and to U.S. Patent No. 11,257,302 ("the '302 patent"), which duly and legally issued on February 22, 2022. The '302

patent is entitled "Parking Meter System." A copy of the '302 patent is attached as Exhibit 2.

87.    MPS is the owner of the entire right, title, and interest in and to U.S. Patent No. 11,688,205 ("the '205 patent"), which duly and legally issued on June 27, 2023. The '205 patent is entitled "Parking Meter System." A copy of the '205 patent is attached as Exhibit 3.

88.    MPS is the owner of the entire right, title, and interest in and to U.S. Patent No. 12,142,085 ("the '085 patent"), which duly and legally issued on November 12, 2024. The '085 patent is entitled "Parking Meter System." A copy of the '085 patent is attached as Exhibit 4.

89.    MPS is the owner of the entire right, title, and interest in and to U.S. Patent No. 12,249,187 ("the '187 patent"), which duly and legally issued on March 11, 2025. The '187 patent is entitled "Parking Meter System." A copy of the '187 patent is attached as Exhibit 5.

90.    The claims of the Patents-in-Suit carry a presumption of validity under 35 U.S.C. § 282(a) and are enforceable.

## THE PATENTS-IN-SUIT CLAIM SIGNIFICANT TECHNOLOGICAL ADVANCEMENTS IN PARKING INDUSTRY TECHNOLOGY

91.    The Patents-in-Suit provided novel and counterintuitive technical solutions to specific parking industry problems of monitoring and managing parking facilities in a cost-effective manner, while improving enforcement (and parking compliance) and increasing revenues.

92.    As of March 2013 and even as of 2014 and later, the methods of monitoring and managing parking in a parking facility claimed by the Patents-in-Suit contained inventive concepts that improved on existing parking industry technology and were not well-understood, routine, or conventional activity.

93.    For example, the asserted claims comprise methods that allow gateless parking facility management and remote enforcement and include novel combinations of capturing image

data of a vehicle entering a parking facility, capturing image data of a vehicle exiting a parking facility, recording vehicle entry and exit times, transmitting the image data to a remote networked computer system, determining that a parking violation has occurred, including overstays of grace periods, and issuing a parking violation, including automatically by the remote networked computer system. Such methods were not conventional in the parking industry as of March 2013 and even as of 2014 and later.

94.    The inventions of the asserted claims of the Patents-in-Suit provide many advantages over conventional parking industry monitoring and enforcement technology and provided specific solutions to technical problems in the parking industry.

95.    Attached as Exhibit 21 is a true and correct copy of declaration testimony from parking industry expert Saad Bedros, Ph.D., with the accompanying Exhibit A, that is in the reexamination file for the '302 patent.

96.    Declaration testimony from Dr. Bedros in reexamination files for several of the Patents-in-Suit states that one of the patents' inventive concepts is the use of automated, intelligent monitoring for reliable, 24/7 enforcement of parking rules. "This increases compliance and captures incremental revenue while saving property owners significant capital investment, maintenance, and employee costs due to reduced personnel and equipment." *E.g.,* Exhibit 21, ¶10.

97.    Declaration testimony from Dr. Bedros also states that "[i]ssuing parking violation notices traditionally requires a human parking enforcement person to draft the parking citation and place a physical notice of the violation (a parking ticket) on the violating vehicle. Doing this is labor intensive because it requires a person to actively monitor the parking lot and manually issue the violation notices. The parking enforcement person cannot catch all violations

because they cannot be everywhere at once for all hours of the day and every day of the year. Thus, the traditional process for issuing parking violations notices requires the cost of employing personnel to issue violation notices and only a fraction of the violations will be captured. The invention of the '302 patent significantly improves on this traditional issuance of violation notices by providing for the automatic issuance of violation notices by computer systems to the vehicle's owner for all violations that occur in the parking lot. The result is that revenue is increased while overhead is decreased." *E.g.,* Exhibit 21, ¶11 (Decl. of Saad Bedros, PhD.).

98.     The '302 patent specification states that "[t]he parking management technology herein is directed to parking lots, ramps and streets for monitored parking use and for ticketing as required by system software logic without the need for on-premises attendant personnel. The invention can be used, for example, for unattended lots, ramps and street situations." Exhibit 2, 2:20-25.

99.     The '302 patent states that "[t]he lot monitoring embodiments discussed herein eliminate the cost of lot monitoring personnel and also automatically capture all violators. Thus revenue is enhanced." Exhibit 2, 2:25-28.

100.     Each of the '302, '205, '085, and '187 patents is part of the same patent family and shares a specification.

101.     The '172 patent is a continuation-in-part of the application that resulted in the '302, '205, '085, and '187 patents and has a specification with overlapping disclosures.

**A.     Examples of Specific Technical Advances and Advantages**

102.     The Patents-in-Suit explain that the claimed methods allow for remote/offsite management and enforcement of the rules of parking facilities.

103.    By  requiring novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, transmitting the image data to a remote networked computer, determining the identification of the vehicle entering and exiting the parking facility, determining that a parking violation has occurred, and issuance of violation notices, including by the remote networked computer, the claimed methods provided a technical solution for remote/offsite management and enforcement of the rules of parking facilities. The asserted independent claims in each of the asserted patents include such limitations, including for example independent claim 16 of the '302 patent and independent claims 1 and 16 of the '187 patent.

104.    The '302 patent states that the inventions "eliminate the cost of lot monitoring personnel and also automatically capture all violators" and therefore "revenue is enhanced." Exhibit 2, 2:26-28.

105.    The '172 patent states that "[n]ationwide, even worldwide, there are millions of parking spaces in parking lots, hotel lots, parking ramps, onstreet parking, and event parking that require significant manual intervention today by the consumer and the lot ownership …. Various embodiments and features of the various embodiments can automate the entire parking management and payment process and save costs and increase revenues." Exhibit 1, 1:56-63.

106.    The '302 patent also states that "[t]he present invention in certain embodiments increases revenue compared to traditional manual parking meters and manual parking enforcement methods" and that "[c]ertain embodiments of the invention can be configured to… auto enforce any violation without the need for an officer's presence." Exhibit 2, 3:24-34.

107.    The '302 patent also states that "[c]ertain embodiments can perform license plate recognition (LPR) and transmit the jpg and the ASCII data to a remotely-located networked site

for query to the respective department of motor vehicles, issuance of a citation through the mail and fine collections." Exhibit 2, 3:38-42.

108.    The '172 patent states that "[i]n certain embodiments, the invention provides for irrefutable proof of the violation with license plate pictures upon entry, violation and exit by the car." Exhibit 1, 2:15-17.

109.    The '302 patent states that its inventions allow parking that is "all centrally managed and remotely distributed by the city parking department, police or other designated agency." Exhibit 2, 3:60-63.

110.    The '302 patent also states that with its inventions "the operations of all meters in a given system can be monitored and remotely controlled via a central operator." Exhibit 2, 7:15-17.

111.    The '172 patent states that "[w]hile unmanned lots may pose a safety issue or an opportunity to deceptively store vehicles, various embodiments of the present invention recognize vehicle identifications and link the vehicle identity to permits and time of stay and vehicles of interest to law enforcement." Exhibit 1, 1:64-2:1.

112.    At the time of invention of the Patents-in-Suit, it was counterintuitive and unconventional to improve parking facility management and revenue by providing monitoring and enforcement off-site rather than increasing the conventional on-site monitoring and enforcement.

113.    The Patents-in-Suit explain that the claimed methods allow for gateless parking lots while actually improving enforcement and increasing revenue.

114.    Conventionally, gates were used to restrict unauthorized ingress or egress to and from parking facilities, but gates were also known to cause problems and delays when multiple

cars attempted to enter or exit the facility at the same time, for example, after a large venue event.

115.    The claimed techniques, including novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, transmitting the image data to a remote networked computer, determining the identification of the vehicle entering and exiting the parking facility, determining that a parking violation has occurred, and issuing violation notices, provided a technical solution allowing gateless parking lots while actually improving enforcement and increasing revenue.

116.    The asserted independent claims in each of the asserted patents include the limitations in the previous paragraph. Particular asserted claims also recite cameras for capturing the entry and exit image data. *See, e.g.*, Exhibit 5 ('187 patent), claims 1 and 11; *see also* Exhibit 1 ('172 patent), claim 13.

117.    The '302 patent states that "[a]n advantage of certain embodiments is that electromechanical gates can be eliminated, if desired" and that "[s]uch gates are costly and can fail." Exhibit 2, 25:41-43.

118.    The '302 patent describes a "meterless, gateless, unattended parking lot management system." Exhibit 2, 23:25-27.

119.    The '302 patent also states that "the invention provides…much less hassle to the consumer." Exhibit 2, 24:19-24.

120.    The '302 patent states that the inventions "eliminate the cost of lot monitoring personnel and also automatically capture all violators" and therefore "revenue is enhanced." Exhibit 2, 2:26-28.

121.    Declaration testimony from a parking industry expert in reexamination file histories of Patents-in-Suit states that "[the patents-in-suit] further teach [] combining touchless payments with remote enforcement removes the need for gates, reducing congestion and enhancing the user experience." *E.g.,* Exhibit 21, ¶12 (Decl. of Saad Bedros, PhD.).

122.    Attached as Exhibit 20 is a true and correct copy of declaration testimony from Joseph Caldwell, CEO and President of MPS, that is in in the reexamination files for the '302, '172, and '205 patents.

123.    Declaration testimony from Mr. Caldwell in the reexamination file history of three Patents-in-Suit states that the patented technology, which allows for the deployment of automated, intelligent monitoring for reliable, 24/7 enforcement of parking rules, increases "compliance and the capturing of incremental revenue while saving property owners significant capital investment, maintenance and employee costs due to reduced personnel and equipment costs." Exhibit 20, ¶ 7.

124.    At the time of invention of the Patents-in-Suit, it was counterintuitive and unconventional to provide increased revenue and improved parking facility enforcement by a technical solution allowing elimination of physical components like gate arms that conventionally controlled parking facility entry and exit points.

125.    The inventions of the Patents-in-Suit allow for improved compliance and increased revenue by providing remote monitoring of parking lot entrances and exits, rather than individual spaces.

126.    The Montgomery patent cited during the reexamination of the '302, '172, and '205 patents is an example of conventional parking technology that focused on monitoring individual parking spaces as the means to address "technical problems associated with

monitoring and recording the violations within a parking lot." Exhibit 24, 1:52-54. A true and correct copy of the Montgomery patent is attached as Exhibit 24.

127.    Declaration testimony from a parking industry expert in reexamination files for certain Patents-in-Suit states that "because there is a camera at the entrance and the exit of a parking lot, the very purpose of inventive concepts as deduced by the claim is that the vehicles in a parking lot do not exit in the same order they entered. This is important because, by its very nature, the sophisticated use of cameras and associated network systems allows for the parking lot owner to manage the 'whole parking lot' without exacting oversight of each individual parking spot. Additionally, the duration of individual parking vehicles can be calculated, which, at the end of the day, is the most important aspect of providing parking lot owners the convenient opportunity to manage the entire property without unnecessary oversight of individual spots." *E.g.,* Exhibit 21, ¶14 (Decl. of Saad Bedros, PhD.).

128.    The '302 patent specification explains that the inventions provide "a meterless, gateless, unattended parking lot management system."  Exhibit 2, 23:25-27.

129.    The '302 patent states "[t]he vehicle entrance 504 and exit 506 to the lot are monitored because all vehicles must pass through these limited thresholds. Of course, there can be multiple entry / exit points without departing from the scope of the invention. A plate reader 508 or camera is disposed adjacent (or associated with) each entry point 504 and configured to read the vehicle ID of every vehicle entering the parking lot / ramp / facility 300." Exhibit 2, 22:38-46.

130.    The '302 patent states that the invention "provides an unattended, automated parking lot and on street management, with no meters, optionally no kiosk, and much less hassle

to the consumer, while fully automating the violation process for parkers who do not pay, or stay beyond what they have paid for." Exhibit 2, 24:19-24.

131.    The '302 patent states "[t]he lot monitoring embodiments discussed herein eliminate the cost of lot monitoring personnel and also automatically capture all violators. Thus revenue is enhanced." Exhibit 2, 2:25-28.

132.    The claimed techniques, including claims requiring novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, transmission of the image data to a remote networked computer, determining the identification of the vehicle entering and exiting the parking facility, determining that a parking violation has occurred, and issuance of violation notices, provide a technical solution for improved enforcement and increased revenue without providing oversight of each parking spot.  The asserted independent claims in each of the asserted patents include these limitations.

133.    At the time of invention of the Patents-in-Suit, it was counterintuitive to provide improved parking facility enforcement and increased revenue by foregoing additional equipment to monitor individual spaces and instead remotely monitoring entry and exit points of the whole parking facility (e.g., the parking lot).

134.    The Patents-in-Suit explain that the claimed methods allow for elimination of kiosks at parking facilities and/or for contactless payment, while actually improving customer experience and revenue collection and decreasing cost.

135.    By teaching and claiming novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, recording times of entry and exit for the vehicle, transmission of the image data and the time data to a remote networked computer, determining the identification of the vehicle entering and exiting the parking facility,

determining that a parking violation has occurred, and communicating notice of the parking violation to the remote networked computer or issuing a parking violation notice automatically by the remote networked computer, the claimed techniques allow for elimination of kiosks at parking facilities and/or for contactless payment.  Transmission of the parking data to a remote networked computer system allows the networked system to communicate relevant information with customer cell phones directly via the internet or through other online payment vendors, obviating the need for a payment interface such as a kiosk at the parking facility.

136.    The asserted independent claims in each of asserted patents include combinations of these elements including transmission of parking data such as the image data of the vehicle entering and exiting the facility to a remote networked computer system.  Further, the independent claims in the '172 and '187 patents include additional limitations for transmitting additional parking data to a remote networked computer system that further support eliminating kiosks.

137.    The '302 patent states that the invention "provides an unattended, automated parking lot and on street management, with no meters, optionally no kiosk, and much less hassle to the consumer, while fully automating the violation process for parkers who do not pay, or stay beyond what they have paid for." Exhibit 2, 24:19-24.

138.    The '302 patent states "all transactions could be done without the kiosk 312 and the municipality or lot owner could mail out charges to car owners based upon the LPR technology and systems implementation described herein." Exhibit 2, 26:22-25.

139.    The '302 patent states "The payment acceptor 114 can also be configured to accept contactless payments… A QRS picture can also be displayed on the meter's screen for the

user to scan with their phone to submit payment with an appropriate application on their phone enabling such payment method." Exhibit 2, 6:35-45.

140.     The '302 patent states "[t]he lot monitoring embodiments discussed herein eliminate the cost of lot monitoring personnel and also automatically capture all violators. Thus revenue is enhanced." Exhibit 2, 2:25-28.

141.     Declaration testimony from a parking industry expert in reexamination file histories of Patents-in-Suit states that "upon implementing the claimed invention… touchless payment options can be provided that enable mobile, app-less payments (via QR. codes and digital wallets), which can eliminate the need for physical payment kiosks." *E.g.,* Exhibit 21, ¶12 (Decl. of Saad Bedros, PhD.).

142.     Declaration evidence in the reexamination files of three Patents-in-Suit also states that with the inventions, "touchless payment options can be provided that enable mobile, app-less payments (via QR codes and digital wallets), which can eliminate the need for physical payment kiosks" and that "[c]ombining touchless payments with remote enforcement reduces congestion and enhances the experience of persons using MPS's parking systems." Exhibit 20, ¶ 7.

143.     At the time of invention of the Patents-in-Suit, it was counterintuitive to address the problem of effective enforcement and revenue collection by eliminating kiosks from parking facilities.

144.     The Patents-in-Suit explain that the claimed methods allow for provision of a grace period while at the same time providing a technical solution to the loitering problem in the parking industry.

145.    By teaching and claiming novel combinations of capturing entry and exit image data of the vehicle entering the parking facility, transmission of the image data to a remote networked computer, determining the identification of the vehicle entering the parking facility, recording a time of entry for the vehicle, determining that a parking violation has occurred, and issuing a violation notice, the claimed techniques allow for provision of a grace period while at the same time providing a technical solution to the loitering problem in the parking industry.

146.    The asserted independent claims in each of the asserted patents include the limitations in the previous paragraph. Using this specific type of information, the remote networked computer system determines a violation, for example, based on a vehicle loitering longer than a grace period, has occurred even before the vehicle leaves the facility.  In addition, certain asserted claims call out limitations directed to grace period enforcement or enforcement prior to the vehicle leaving the parking facility.  *See, e.g.*, Exhibit 1 ('172 patent) claim 18, Exhibit 2 ('302 patent), claim 3; Exhibit 3 ('205 patent), claim 18; Exhibit 5 ('187 patent), claims 1, 4, 12.

147.    Declaration testimony from a parking industry expert in reexamination files of Patents-in-Suit states that "[m]onitoring individual parking spaces also fails to indicate when a vehicle enters or leaves the parking lot in which the monitored parking space is located. This is important in several respects. For example, it is common for parking lots near bus/train stations and shopping malls for a vehicle to enter a parking lot and loiter in the lot while waiting to pick up a person exiting the station or mall without entering any of the parking spaces. These loitering vehicles clog up travel lanes and create safety hazards within the lot. If the parking management system were monitoring individual parking spaces, then the management system would be

unaware of the dangerous vehicle loitering activity." *E.g.,* Exhibit 21, ¶17 (Decl. of Saad Bedros, PhD.).

148.    The '302 patent states that "a wide variety of payment alternatives and pricing features can be included in certain embodiments, including flexible grace periods…" Exhibit 2, 3:56-57.

149.    The '302 patent states that "This embodiment of the invention provides an unattended, automated parking lot and on street management, with no meters, optionally no kiosk, and much less hassle to the consumer, while fully automating the violation process for parkers who do not pay, or stay beyond what they have paid for." Exhibit 2, 24:19-24.

150.    The '302 patent states that "[i]f the vehicle had not been registered at the kiosk 512 at all by the owner and was illegitimately parking, a violation status is set, thereby automatically triggering a fine and a notice to enforcement authorities…" Exhibit 2, 23:62-65.

151.    The Patents-in-Suit also explain that the claimed methods allow for generation of reports on parking trends specific to each parking lot, monitoring multiple lots from a remote location, and remote setting and managing of rules applicable to each lot.

152.    By teaching and claiming novel combinations of capturing entry and exit image data of the vehicle entering and exiting a particular parking facility, transmitting the image data to a remote networked computer, determining the identification of the vehicle entering and exiting that parking facility, recording a time of entry and exit for the vehicle, determining that a parking violation has occurred, and issuing a violation notice, the claimed techniques allow for generation of reports on trends specific to each parking lot, monitoring multiple lots from a remote location, and remote setting and managing of rules applicable to each lot.

153.    The asserted independent claims in each of the asserted patents include the limitations in the previous paragraph. In addition, some of the claims recite that the parking violations are based on permits or parking class rules which can be defined or accessed by the remote networked computer system. *See, e.g.*, the Exhibit 1 ('172 patent), claims 14, 16; Exhibit 2 ('302 patent), claims 6, 8; Exhibit 4 ('085 patent), claims 5, 13-16; Exhibit 5 ('187 patent), claims 2, 5. All of the resulting data can be recorded, tracked, and reported by the remote networked computer system.

154.    The '172 patent states "[i]n the case of lots / ramps or the like, the space occupancy data is reported. For example , the number of cars currently in the monitored lot / ramp is reported or the number of remaining open spaces, or both, or percentage utilization can be reported. This data allows for analysis to be performed for a variety of reasons, such as price adjustments, traffic analysis, urban planning, etc." Exhibit 1, 14:56-62.

155.    The '172 patent states:


> The control computer can also be configured to generate a variety of reports to the owner/operator for any one or more meter for a given time period. For example, monthly revenue can be summarized on a per-meter (or per-lot or per-space, etc.) basis for all monitored spaces and meters/ kiosks in a given municipality. Other reports, including occupancy trends, customer parking behavior and detailed usage patterns can be generated. Because every transaction is reported and stored in the control computer, the data and reports can be generated without querying the meter/kiosk. Also, the meter/kiosk thus does not have to maintain much or any transaction data, which reduces cost of the meter because memory size can be minimized, and also makes the system more secure and robust because the data is centrally stored.

Exhibit 1, 22:41-55.

156.    The '302 patent states:

> The control computer can also be configured to generate a variety of reports to the owner/operator for any one or more meter for a given time period. For example, monthly revenue can be summarized on a per-meter basis for all meters in a given municipality. Because every transaction is reported and stored in the control computer, the data and reports can be generated without querying the meter. Also, the meter thus does not have to maintain much or any transaction data, which reduces cost of the meter because memory size can be minimized, and also makes the system more secure and robust because the data is centrally stored.

Exhibit 2, 21:31-41.

157.    The '302 patent also states "operators are provided with the ability to change many of the operating parameters of any one or more meters, including the fees, schedules, passcodes, grace periods, maximum time, and permitted cards. Each meter's settings can be accessed through a control screen accessible to the owner/operator via the control computer." Exhibit 2, 20:49-54.

158.    The '172 specification states that "[t]he monitored space / lot / ramp owners / operators are provided with the ability to change many of the operating parameters of any one or more monitored spaces / lots / ramps, including the fees, schedules, passcodes, grace periods, maximum time, and permitted cards." Exhibit 1, 21:59-67.

159.    The '172 patent states that "a given kiosk 512 can simultaneously serve …as a kiosk for any and all kiosk functions including parking monitoring a[nd] payment for non-adjacent parking spaces/lots/ramps." Exhibit 1, 26:13-17.

160.    The '302 patent states that "Parking parameters can also be set and updated by a remote computer system networked to the parking meter." Exhibit 2, 3:22-23.

161.    The '302 patent states that "[t]his ability to designate multiple different class rules for parking authorization, parking parameters (e.g., grace period length and maximum parking

time), corresponding rates (e.g., general, free and discount, etc.), corresponding fine rates, and even geographically customize certain privileges for individual vehicles is not possible with conventional parking meters and permitting schemes." Exhibit 2, 17:43-50.

162.    The '302 patent also states that "[a]ny of the meter features of the previous embodiments can also be incorporated into or used in conjunction with the kiosks of the present embodiment. Therefore those features will not be repeated again." Exhibit 2, 23:3-6.

### B.    Additional Real-World Evidence

163.    There is also substantial additional real-world evidence that inventions of the Patents-in-Suit were significant technological advancements and solved specific technical problems in the parking industry.

*PRRS and Asura Technologies*

164.    On information and belief, a company called Asura Technologies has a "partnership" with defendant PRRS.

165.    Asura Technologies' website explains that "while history is rife with attempts to create comprehensive parking compliance systems, **many encountered unforeseen challenges.**" https://asuratechnologies.com/parking/ (emphasis added).

166.    As explained above and below herein, MPS's inventions solved technical problems in the parking industry, and the MPS Patents-in-Suit cover the methods MPS invented to solve these challenges.

167.    As explained above and below herein, defendant PRRS then took MPS's inventions and used them without authorization and without license in PRRS's infringing ARC systems/services.

168.    Asura Technologies' website describes ARC systems/services that adopted the

parking monitoring and management technology MPS invented.

169.    Asura Technologies describes ARC systems/services as a "parking compliance" technology that provides "a seamless journey", with "camera sensors" that provide a "Lot Entry Event," a "Grace Period," and an "Exit Event".

170.    Asura Technologies posted the below graphic on its website:



https://asuratechnologies.com/parking/.

171.    A March 11, 2024 online article in Cities Today ("Cities Today") quotes the CEO of Asura Technologies describing the ARC systems/services as follows:

> [W]e install a camera system, typically placing moderately priced cameras on poles around 3-3.5 meters high, on which our artificial intelligence-based software runs. This software synchronously monitors and analyses images captured from multiple angles, reads licence plates, tracks vehicles, and establishes the logic for decision-making. Subsequently, connected to a state vehicle database, it retrieves owner information based on this data and issues fines to those who have not paid parking fees.

https://cities-today.com/industry/reshaping-parking-compliance-through-technology/

172.    Cities Today describes the ARC systems/services as an approach that "revolutionize[s] parking operations."  https://cities-today.com/industry/reshaping-parking-compliance-through-technology/

173.    Cities Today describes the ARC systems/services as an approach that "signifies a paradigm shift in parking enforcement and compliance."  https://cities-

today.com/industry/reshaping-parking-compliance-through-technology/

174.    Cities Today states that the ARC system includes "Automated Notice Generation" and provides "Increased Revenue" and that there is a "surging demand for ARC's capabilities." https://cities-today.com/industry/reshaping-parking-compliance-through-technology/

### *Clancy Industries, Inc.*

175.    Clancy Industries, Inc. ("Clancy") is another one of MPS's competitors in the parking industry.

176.    In 2020, seven years after MPS's inventions of the Patents-in-Suit, Clancy claimed to have independently invented a method that is within the scope of, and thus covered by, claims of MPS patents.

177.    Under the Manual of Patent Examining Procedure, when examining claims of a utility application USPTO patent examiners are required to examine each claim for compliance with 35 U.S.C. § 101, which addresses patent-eligible subject matter. MPEP § 2103 ("Determine whether the claimed invention complies with 35 U.S.C. § 101"); MPEP 2106. This involves determining if the claimed invention falls within the categories of inventions eligible for patent protection.

178.    After examining Clancy's claims, the USPTO did not reject Clancy's claims under 35 U.S.C. § 101.

179.    That the USPTO did not reject Clancy's claims under 35 U.S.C. § 101 means the USPTO determined that Clancy's claims were directed to eligible subject matter.

180.    The USPTO rejected Clancy's claims as obvious in view of a patent application from the MPS family of patents.

181.    Specifically, on December 3, 2020, Clancy, with another subsidiary affiliated with

Clancy's CEO, Mr. Stanley Wolfson, filed a patent application with the U.S. Patent &

Trademark Office, U.S. Application 2020/0180740 entitled "Camera Parking Enforcement" (the

"Clancy Application").

182.    The Clancy Application sought a patent for the following method:

> **13**. A method of camera parking enforcement, comprising:
>
>  recording, by an intelligent network of cameras, a vehicle entering a designated parking area, and the vehicle leaving the designated parking area;
>
>  receiving, by an enforcement computing device, a first signal from the intelligent network of cameras indicating the vehicle entering the designated parking area;
>
>  receiving, by the enforcement computing device, a second signal from the intelligent network of cameras indicating the vehicle leaving the designated parking area;
>
>  receiving, by the enforcement computing device, a third signal from at least one payment processor;
>
>  determining, by the enforcement computing device, a lot time based on the vehicle being in the designated parking area;
>
>  comparing, by the enforcement computing device, the lot time to a payment confirmed by the at least one payment processor;
>
>  issuing, by the enforcement computing device, a notice of violation for the vehicle when the vehicle remains in the designated parking area for longer than an allowed time based on the payment confirmed by the at least one payment processor.
>
> **14**. The method of claim **13**, further comprising providing a buffer time so that the vehicle can enter and exit the designated parking area without requiring payment.

37

183.    During prosecution of the Clancy Application, the Examiner rejected the Clancy Application citing one of MPS's patent applications at that time (Hudson et al., U.S. Patent Publication 2014/0214499):



Application/Control Number: 17/247,201                         Page 3
Art Unit: 2689

6.        Claims 1-20 are rejected under 35 U.S.C. 103 as being unpatentable over Hudson et al. [U.S. Patent Publication 2014/0214499] in view of Sun et al. [U.S. Patent Publication 2021/0224769]

With regard to claim 1, Hudson et al. meets the limitations of:

- a system for camera parking enforcement comprising an intelligent network of cameras including at least one camera to record a vehicle entering a designated parking area, and at least one camera to record the vehicle leaving the designated parking area [the use of cameras to detect when a vehicle enters a parking spot, parks, and leaves the parking spot (paragraph 0041 and figure 16, items 402, 410, and 412)]

184.    Hudson et al. is a patent application filed by MPS.

185.    The Clancy Application was never granted and was ultimately abandoned.

### *Other Parking Industry Sources*

186.    Various parking industry companies and publications have recognized that "gateless" and/or "touchless" parking, which was enabled by MPS's inventions of the Patents-in-Suit, was an "innovative" approach that is "revolutionizing" the industry.

187.    In 2023, Pave Mobility stated that "[g]ateless parking, often referred to as 'touchless parking' or 'frictionless parking,' offers a range of benefits that can **revolutionize** the parking experience for both operators and customers." https://pavemobility.com/2023/10/13/the-future-of-parking-exploring-the-benefits-of-gateless-parking/ (emphasis added).

188.    In 2023 Pave Mobility also explained that "[w]hile gateless parking may **sound counterintuitive**, it can actually enhance security" and that "gateless parking offers numerous benefits that are changing the landscape of parking in our modern world."

https://pavemobility.com/2023/10/13/the-future-of-parking-exploring-the-benefits-of-gateless-parking/ (emphasis added).

189.    In 2023 Pave Mobility also explained that "traditional parking facilities with entrance and exit gates are gradually giving way to gateless parking systems. Gateless parking, often referred to as 'touchless parking' or 'frictionless parking,' offers a range of benefits that can **revolutionize the parking experience** for both operators and customers."

https://pavemobility.com/2023/10/13/the-future-of-parking-exploring-the-benefits-of-gateless-parking/ (emphasis added).

190.    An article on the website of Premium Parking with a date of 10/11/2024 states that "License Plate Recognition (LPR) cameras were installed to use Premium's GLIDE Eye LPR®. These cameras detect those who chose to not pay for their parking session and send invoice through the mail, ensuring that all parkers comply, and revenue can be collected." The article further states that "Transactions and **revenue increased substantially** since Premium went live in late February 2024. Each subsequent month **saw double digit percentage increases**, peaking in May with a 47% percent increase in transactions and 63% increase in revenue. With the help of Premium's gateless solution, visitors and workers benefit from a seamless parking operation, while the owners continue to experience growth." https://www.premiumparking.com/blog/article/enhanced-enforcement-and-signage-drives-revenue-in-bustling-chicago (emphasis added).

191.    Parking industry website https://gatelessparking.com/ ("Gateless Parking") describes automatically generating violation notices as "**THE. BIG. DEAL.**" https://gatelessparking.com/solution (emphasis added). Gateless Parking explains that its system "will automatically generate notices for non-payment the next business day." *Id.*

192.    Gateless Parking also states that gateless lots allow one to "[a]void the pains of installing and maintaining physically barriers in locations that are not ideal for this type of operation" and that "[u]tilizing our gateless features streamlines the experience for the parking public." https://gatelessparking.com.

193.    Gateless Parking also states "Ever have your parking lot jammed by a parker who just can't get themselves parked? yeah, us too. With no gates on your surface lot the egress is no problem for your customers, they just drive and go."  https://gatelessparking.com/solution.

194.    A parking industry blog states that "gateless parking, also known as 'touchless' or 'frictionless' parking…offer[s] a seamless parking experience" and is an "**innovative approach** [that] eliminates the need for entrance and exit gates, enhancing efficiency and convenience for both operators and customers." https://parkingmanagementhub.com/blog/future-of-parking-gateless-technology (emphasis added).

195.    The OperationsCommander blog states that "Gateless parking is **transforming how we think** about urban mobility." https://operationscommander.com/blog/gate-no-more-a-deep-dive-into-gateless-parking-technologies/ (emphasis added).

196.    A 2023 blog post from Allerin states that "The **Future of Parking** is Gateless." https://www.allerin.com/blog/the-future-of-parking-is-gateless (emphasis added).

**B.    The USPTO Has Consistently Found the Claims of MPS's Patents Are Directed to Patent-Eligible Subject Matter**

197.    Under the Manual of Patent Examining Procedure, USPTO patent examiners, in their examination of claims of a utility application, are required to examine each claim for compliance with 35 U.S.C. § 101, which addresses patent-eligible subject matter. MPEP § 2103, 2106. This involves determining if the claimed invention falls within the categories of inventions eligible for patent protection.

198.    After examining MPS's claims, the USPTO repeatedly determined that MPS's claims qualify as eligible subject matter under 35 U.S.C. § 101.

199.    The '172 patent issued on November 6, 2018.

200.    The '172 patent was examined by the USPTO, and the USPTO did not issue any rejections based on patentable subject matter under 35 U.S.C. § 101.

201.    The '302 patent issued on February 22, 2022.

202.    The '302 patent was examined by the USPTO, and the USPTO did not issue any rejections based on patentable subject matter under 35 U.S.C. § 101.

203.    The '205 patent issued on June 27, 2023.

204.    The '205 patent was examined by the USPTO, and the USPTO did not issue any rejections based on patentable subject matter under 35 U.S.C. § 101.

205.    The '085 patent issued on November 12, 2024.

206.    The '085 patent was examined by the USPTO, and the USPTO did not issue any rejections based on patentable subject matter under 35 U.S.C. § 101.

207.    The '187 patent issued on March 11, 2025.

208.    The '187 patent was examined by the USPTO, and the USPTO did not issue any rejections based on patentable subject matter under 35 U.S.C. § 101.

**C.    The USPTO Conducted *Ex Parte* Reexaminations of Claims of the '172, '302, and '205 Patents and Patentability Was "Confirmed" In View of Additional Prior Art**

209.    A third party submitted a request for *ex parte* reexamination of claims 12-16, 18, and 19 of the '172 patent on August 28, 2024.

210.    The USPTO granted the request for reexamination of claims 12-16, 18, and 19 of the '172 patent and conducted a reexamination.

211.    The USTPO issued a Reexamination Certificate finding that "the patentability of claims 12-16, 18, and 19 [of the '172 patent] is confirmed" on March 19, 2025.

212.    A third party also submitted a request for *ex parte* reexamination of claims 1-8 and 12-14 of the '302 patent on August 28, 2024.

213.    The USPTO granted the request for reexamination of claims 1-8 and 12-14 of the '302 patent and conducted a reexamination.

214.    The USTPO issued a Reexamination Certificate finding that "the patentability of claims 1-8 and 12-14 [of the '302 patent] is confirmed" on March 20, 2025.

215.    A third party also submitted a request for *ex parte* reexamination of claims 16-20 of the '205 patent on August 28, 2024.

216.    The USPTO granted the request for reexamination of claims 16-20 of the '205 patent and conducted a reexamination.

217.    The USTPO issued a Reexamination Certificate finding that "the patentability of claims 16-20 [of the '205 patent] is confirmed" on March 17, 2025.

**D.    Additional Declaration Testimony in the Reexamination Files of the '172, '302, and '205 Patents**

218.    Additional declaration testimony in the reexamination files of the '172, '302, and '205 patents provides additional evidence that the inventions of asserted claims contained inventive concepts and provided specific technical improvements to existing parking industry technology.

219.    Declaration testimony from a parking industry expert in the reexamination file for the '302 patent states that "among many inventive concepts of the '302 patent, I am aware that the '302 Patent specifically claims limitations directed to camera usage for events regarding vehicles that enter and exit parking lot. Using the time stamp information associated with it to

process fees/fines/grace periods, and importantly, automating a collection system that processes the fees to vehicle owners. This enabled the parking system, or parking lot management system, to flag parking violations before a vehicle exits the lot because they did not timely submit payment or overstayed a pre-purchased parking time." Exhibit 21, ¶9 (Decl. of Saad Bedros, PhD.).

220.    Attached as Exhibit 22 is a true and correct copy of declaration testimony from Saad Bedros, Ph.D., with the accompanying Exhibit A, that is in in the reexamination file for the '172 patent.

221.    Declaration testimony from a parking industry expert in the reexamination file for the '172 patent states that "[a]mong many inventive concepts of the '172 patent, I am aware that the '172 Patent specifically claims limitations directed to camera usage for events regarding vehicles that enter and exit parking lots. Of course, using the time stamp information associated with it to process fees/fines/grace periods, and importantly, automating a collection system that processes the fees to vehicle owners. This enabled the parking system, or parking lot management system, to flag parking violations before a vehicle exits the lot because they did not timely submit payment or overstayed a pre-purchased parking time." Exhibit 22, ¶9 (Decl. of Saad Bedros, PhD.).

222.    Attached as Exhibit 23 is a true and correct copy of declaration testimony from Saad Bedros, Ph.D., with the accompanying Exhibit A, that is in the reexamination file for the '205 patent.

223.    Declaration testimony from a parking industry expert in the reexamination file for the '205 patent states that "[a]mong many inventive concepts of the '205 patent, I am aware that the '205 Patent specifically claims limitations directed to camera usage for events regarding

vehicles that enter and exit parking lots. Using the time stamp information associated with it to process fees/fines/grace periods, and importantly, automating a collection system that processes the fees to vehicle owners. This enabled the parking system, or parking lot management system, to flag parking violations before a vehicle exits the lot because they did not timely submit payment or overstayed a pre-purchased parking time." Exhibit 23, ¶9 (Decl. of Saad Bedros, PhD.).

## OVERVIEW OF DEFENDANTS' INFRINGEMENT

224.    Upon information and belief PRRS (and/or alternatively PRRS's customers) has directly infringed claims of the Patents-in-Suit, literally or via the doctrine of equivalents, by performing methods of parking monitoring and managing that are protected by the Patents-in-Suit at various parking facilities throughout the United States including in this District.

225.    For example, on information and belief PRRS provides an "Automated Recognition and Compliance System" ("ARC" system) to automatically capture image data of a vehicle entering and exiting a parking facility, identify and record the time of a vehicle entering and exiting, determine that a parking violation has occurred, and issue a parking violation notice.

226.    ARC" stands for "Automated Recognition and Compliance System, ARC for short."  https://prrsparking.com/complianceprograms.html.

227.    Upon information and belief, such ARC system/services infringes MPS's inventions as defined by one or more claims of the Patents-in-Suit, as alleged herein, including as alleged in the attached Exhibits 11A through 15A which are incorporated herein by reference.

228.    PRRS also refers to its ARC systems/services as "compliance programs" for parking facilities, and PRRS explains that such programs "enable[] 24-hour real time monitoring of facilities using free flow traffic methods." https://prrsparking.com/complianceprograms.html.

229.    PRRS's website explains that its ARC system/services provides "parking lot monitoring" via "fixed LPR [license plate recognition]" as well as "[violation] notice and data management":

PRRS ensures superior performance from existing assets owned and operated by an operator by monitoring the usage of an asset or area to ensure compliance with the operator's terms of service, operating rules, access authorizations and fee schedules.

## THE 5 FOUNDATIONS
## OF OUR COMPLIANCE PROGRAM

    

https://prrsparking.com/services.html.

230.    Upon information and belief PRRS has provided and continues to provide its automated parking monitoring and management systems/services to parking facility operators, including, without limitation, LAZ Parking, under the "ARC" name.

231.    For example, PRRS's website explains that it provides "monitoring" of parking lots using its "automated ARC System" to "identify exceptions to [lot operators'] rules and terms of service" and "ensure that exceptions are identified and documented efficiently." https://prrsparking.com/services.html#serviceDetails.

232.    PRRS's ARC system/services provide "notice and data management," via "software [that] automates the enforcement and management process in one holistic solution to streamline notice issuance and processing." https://prrsparking.com/services.html#serviceDetails.

233.    Use of PRRS's ARC system/services includes "register[ing]" a vehicle "upon entry and exit using ALPR," "record[ing]" the "parking event…in the database," checking for

"[p]ayment confirmation," and "retriev[ing] vehicle owner data and issu[ing] notices for operating rules exceptions":



https://prrsparking.com/complianceprograms.html#complianceDetails.

234.    Upon information and belief, the "ALPR" referenced on PRRS's website refers to "Automated License Plate Recognition."

235.    On information and belief, PRRS' ALPR uses cameras to capture images of vehicle license plates as they enter and exit a parking facility and then employs optical character recognition ("OCR") technology to convert the images into text, which the system then compares against databases of license plate registrations and is used by the system to issue a parking violation notice, for example if a certain time period had expired without payment.

236.    Upon information and belief, PRRS posted a promotional video regarding its "ARC" system on YouTube, at the following url: https://www.youtube.com/watch?v=SOOz-6riR2c

237.    Below is a true and correct copy of a screenshot from the video at the url https://www.youtube.com/watch?v=SOOz-6riR2c, at the 1:55 mark:



238.    Upon information and belief, PRRS's ARC system/services automatically issues

parking violation notices in the event the system detects that a vehicle that entered and exited the

parking facility did not pay for parking within a certain grace period.

239.    Upon information and belief, PRRS posted a video at the following url that also

explains its "ARC" system: https://www.facebook.com/Parkingprrs/videos/768476596907647.

240.    The video posted at

https://www.facebook.com/Parkingprrs/videos/768476596907647 states:

> "The license plate recognition camera, grabs the license plate
> image of the customer captures the time that they entered the lot. It
> gives them a 10 minute grace period to walk to the pay station and
> pay the pay station. If they don't pay and they don't meet that 10
> minute grace period and they remain on the lot when they exit the
> lot. It'll capture their exit time and then that information will be
> sent to our screamer program, PRRS's enforcement system, and
> it'll send a letter to that person within one to two business days of a
> violation that they were either over time or they didn't pay the
> parking fee for the day."

241.    Upon information and belief, the individual shown and featured in the video

posted at https://www.facebook.com/Parkingprrs/videos/768476596907647 is PRRS's CEO John

Conway.

242.    Upon information and belief, PRRS also provides customers and potential customers with documents describing PRRS's "ARC" "Parking Compliance" system/services.

243.    Exhibit 10 is a true and correct copy of a PRRS document provided to PRRS customers or potential customers describing PRRS's ARC system/services.

244.    PRRS describes its "ARC Frictionless Compliance" system on its website, including at the url https://prrsparking.com/complianceprograms.html#complianceDetails.

245.    PRRS's website provides the following depiction of its "ARC Frictionless Compliance" system:



PRRS takes parking facility monitoring to the next level with its 24/7 automatic, gate- and barrierless solution. Lot monitoring is automatized by installing cameras at the access points of the parking lot to capture each entry and exit event. Payment information of the parking events are retrieved from onsite payment terminals, contract management software, reservation platforms, and other digital payment solutions to confirm authorization and payment to the facility.

**FEATURES:**

- Vehicles are identified at entry and exit using ALPR.
- Payment is confirmed based on license plate by querying appropriate payment solutions.
- Operating exceptions are identified and include appropriate event details which are provided to the parking operator.
- Parking Sessions and occupancy are monitored real time



https://prrsparking.com/complianceprograms.html#complianceDetails.

246.     Upon information and belief, PRRS provides its ARC system/services with various packages.

247.     PRRS's website depicts several "ARC" packages.



https://prrsparking.com/complianceprograms.html.

248.     One example of infringing automated parking monitoring and management systems/services PRRS provides to its customers is, on information and belief, called "ARC360."

249.     On information and belief, PRRS's "ARC360" includes use of PRRS's "Frictionless Compliance" system.

250.     Another example of infringing automated parking monitoring and management systems/services PRRS provides to its customers is, on information and belief, called "ARC135."

251.     On information and belief, PRRS's "ARC135" includes use of PRRS's "Frictionless Compliance" system.

https://prrsparking.com/complianceprograms.html#complianceDetails ("PRRS provides its state-of-the-art frictionless technology…").

252.    On information and belief, PRRS's ARC system/services, including but not limited to use of the ARC "Frictionless Compliance" system, and including but not limited to ARC360 and ARC135, results in PRRS performing all of the claimed steps and therefore directly infringing claims of the Patents-in-Suit the United States, the State of Texas, and this District, as alleged above and further below and also as shown in the attached Exhibits 11A through 15A, which are incorporated as if fully set forth herein.

253.    On information and belief, LAZ Parking has contracted for PRRS's automated parking monitoring and management systems/services at parking lots operated by LAZ Parking, including at lots in Austin, Texas as alleged above, and on information and belief such systems/services include use of PRRS's "ARC" system/services, including the "Frictionless Compliance" system.

254.    On information and belief, the PRRS "ARC" systems/services used at LAZ Parking-operated parking lots, including LAZ Parking-operated parking lots in Austin, Texas, infringes claims of the Patents-in-Suit the United States, the State of Texas, and this District, as alleged herein and in the attached Exhibits 11A through 15A.

255.    By contracting with PRRS for the infringing "ARC" systems/services at LAZ Parking operated parking lots, upon information and belief LAZ Parking has induced infringement of the Patents-in-Suit the United States, the State of Texas, and this District, as alleged above and further below.

256.    In the alternative, to the extent some automated parking monitoring and management systems/services provided by PRRS require that the claimed steps are performed by a combination of PRRS and its customer, on information and belief and as also alleged below the performance of one or more of the claimed steps by a PRRS' customer is attributable to PRRS,

or alternatively the performance of one or more infringing steps by PRRS is attributable to PRRS's customer under the theory of joint infringement as also alleged further below, at least by virtue of the contract between PRRS and its customer. In this instance, the combination of PRRS and its customer perform all of the claimed steps of the asserted claims of the Patents-in-Suit, as alleged herein and as shown in each of Exhibits 11A through 15A, which are incorporated here by reference.

257. In the alternative, PRRS has been and is indirectly infringing the Patents-in-Suit by actively inducing and/or contributing to the direct infringement by others of the Patents-in-Suit in the United States, the State of Texas, and this District, PRRS and is liable for infringement under 35 U.S.C. §§ 271(b) and/or (c).

## DEFENDANTS' KNOWLEDGE OF THE PATENTS-IN-SUIT

258. Upon information and belief, Defendants knew about the Patents-in-Suit prior to the filing of this Complaint or were willfully blind to them.

259. MPS has complied with the marking and notice requirements of 35 U.S.C. § 287.

260. Each of the Patents-in-Suit is part of the same patent family.

### (i) LAZ Parking's Knowledge

261. MPS incorporates paragraphs 258 through 260 above as if fully set forth herein.

262. MPS put LAZ Parking on notice of at least the '172 Patent during a spring 2022 meeting between MPS and LAZ Parking.

263. LAZ Parking is a customer of one of MPS's competitors, PRRS.

264. MPS has previously enforced the '172, '205, and '302 patents of the Patents-in-Suit against one of its other competitors in the U.S. District Court for the District of Colorado.

265. MPS' patented innovations and its enforcement of its patent rights has been

reported in industry news, including prior to the filing of this Complaint. *See, e.g.*, https://www.parking.net/parking-news/municipal-parking-services-mps/leads-the-smart-parking-industry-with-patented-innovations.

266.     Upon information and belief, LAZ Parking was aware of MPS's enforcement of the '172, '205, and '302 patents in the District of Colorado prior to the filing of this Complaint.

267.     In addition, MPS advertises its "ALPR patented technology for gateless lots & garages" and explains that such technology "[i]ncrease[s] parking revenue & improve[s] compliance." https://municipalparkingservices.com/solutions-lots-and-garages. MPS also explains that its "patented technology platform" provides "innovative payment and enforcement solution options." https://municipalparkingservices.com/about-our-story.

268.     Moreover, MPS is, and was prior to the filing of the Complaint, well-known in the parking industry as a vendor of automated parking monitoring and management technology.

269.     Upon information and belief, LAZ Parking gained knowledge of the Patents-in-Suit prior to filing of this Complaint, at least from its meeting with MPS, from MPS' patent enforcement suit in Colorado, and/or its familiarity with MPS as a well-known supplier of patented parking technology in the industry.

270.     At least in view of the above, upon information and belief, LAZ Parking knew about the Patents-in-Suit prior to the filing of this Complaint or was willfully blind to them.

271.     At least as of the filing of this Complaint, LAZ Parking will also have knowledge of the Patents-in-Suit.

### (ii) PRRS's Knowledge

272.     MPS incorporates paragraphs 258 through 271 above as if fully set forth herein.

273.     PRRS is a competitor of MPS.

274.    PRRS is aware of MPS and was aware of MPS prior to the filing of this Complaint.

275.    Upon information and belief, one of PRRS's customers is LAZ Parking.

276.    Upon information and belief, PRRS was aware of MPS's enforcement of the '172, '205, and '302 patents in the U.S. District Court for the District of Colorado prior to the filing of this Complaint.

277.    Upon information and belief, PRRS gained knowledge of the Patents-in-Suit prior to filing of this Complaint from its customer LAZ Parking, its knowledge of MPS's patent enforcement suit in Colorado, and/or its familiarity with MPS and MPS's patents covering parking monitoring technology as a competitor in the same industry including by the publicization of MPS's patent enforcement activities and patent rights as alleged above.

278.    At least in view of the above, upon information and belief, PRRS knew about the Patents-in-Suit prior to the filing of this Complaint or was willfully blind to them.

279.    At least as of the filing of this Complaint, PRRS will also have knowledge of the Patents-in-Suit.

280.    On information and belief, and as alleged above, Defendants have known of the existence of the Patents-in-Suit and their applicability to PRRS's automated parking monitoring and management systems/services, and Defendants' acts of infringement have been willful and in disregard for the Patents-in-Suit, without any reasonable basis for believing that it had a right to engage in the infringing conduct, at least as of the dates of knowledge of the Patents-in-Suit alleged above, and no later than the filing date of this Complaint.

## COUNT 1
### Infringement of U.S. Patent No. 10,121,172

281.    MPS incorporates the paragraphs above as if fully set forth herein.

282.    MPS is the assignee of all right, title and interest in the '172 Patent, a copy of which is attached as Exhibit 1.

283.    Upon information and belief, PRRS has infringed claims of the Patents-in-Suit, directly or indirectly, by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, for and/or at parking facilities of its customers throughout the United States, including parking facilities of customers located in this District.

284.    Upon information and belief, PRRS has directly infringed and continues to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, claims of the '172 Patent by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including but not limited to, using such systems/services at parking facilities located in this District.

285.    Upon information and belief, such infringement includes PRRS's "Automated Recognition and Compliance" ("ARC") system/services. For example, upon information and belief, PRRS deploys its "ARC" system/services at parking facilities of PRRS's customers, and in so doing PRRS performs each step of claims 12, 13, 14, 16, 18, and 19 of the '172 Patent and therefore infringes at least those claims. A comparison of claims 12, 13,14, 16, 18, and 19 of the '172 Patent to PRRS's ARC system/services is attached as Exhibit 11A, which is incorporated herein by reference.

286.    Upon information and belief, PRRS knew of the '172 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

287. In the alternative, PRRS is liable for direct infringement under the theory of joint infringement. Upon information and belief, the automated parking monitoring and management systems/services provided by PRRS to its customers (including the ARC system/services) require at least that some combination of PRRS and its customer use such system/services and perform all the steps recited by claims of the '172 patent, including at least claims 12, 13, 14, 16, 18, and 19. Further, upon information and belief, to the extent such system/services provided by PRRS involves PRRS's customer performing some of the claimed steps and PRRS itself performing others, all of the claimed steps are nevertheless attributable to PRRS under the theory of joint infringement due to a contractual relationship between PRRS and its customer where PRRS directs its customer to perform the claimed steps that PRRS itself does not perform.

288. Upon information and belief, PRRS also provides its customers with detailed instructions regarding how to perform the claimed steps, and resources for helping them to do so.

289. In addition, upon information and belief PRRS contracts with its customers to condition receipt of the benefit of its automated parking monitoring and management systems/services on those customers' performance of any steps of using such systems/services that PRRS itself does not perform, according to terms prescribed by PRRS as part of its contract with the customer.

290. Upon information and belief PRRS also maintains control over the use by its customers of the systems providing the parking monitoring, including the ARC system/services. For example, the "Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website at https://prrsparking.com/legal.html, states PRRS's customers' "use of the ARC Software will be solely in accordance with the documentation [provided by PRRS], this

Agreement, and such reasonable instructions as PRRS may provide from time to time." Exhibit 16, p.1.

291.    Exhibit 16 is a true and correct copy of the "Facility Monitoring and Compliance Agreement Terms and Conditions" that is posted on PRRS's website at https://prrsparking.com/legal.html.

292.    In the alternative, PRRS has been and is indirectly infringing the '172 Patent by actively inducing and/or contributing to the direct infringement by PRRS's customers of the '172 Patent in the United States, the State of Texas, and this District.

293.    Upon information and belief, PRRS knew of the '172 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

294.    Upon information and belief and as alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and/or have been in use at parking lots operated by PRRS customers, infringe claims of the '172 patent, including claims 12, 13, 14, 16, 18, and 19. A comparison of claims 12, 13, 14, 16, 18, and 19 of the '172 Patent to PRRS's ARC system/services is attached as Exhibit 11A, which is incorporated herein by reference.

295.    In the alternative, upon information and belief, PRRS has been and is now has been and is now in violation of 35 U.S.C. § 271(b) by knowingly and intentionally inducing infringement of claims of the '172 Patent, including at least claims 12, 13, 14, 16, 18, and 19. Upon information and belief, PRRS specifically intended and was aware that the ordinary and customary use of its automated parking monitoring and management systems/services, including the ARC system/services, by its customers would infringe the '172 Patent.

296. Upon information and belief, PRRS took active steps to encourage its customers to use and operate PRRS's automated parking monitoring and management systems/services at parking facilities of PRRS customers, despite knowing of the '172 Patent, in a manner PRRS knew to directly infringe claims of the '172 Patent, including at least claims 12, 13, 14, 16, 18, and 19. Further, upon information and belief PRRS provides product and/or service manuals and other technical information that cause its customers and/or other third parties to use and to operate the ARC system, for its ordinary and customary use, such that PRRS's customers and/or other third parties have directly infringed the '172 Patent, through the normal and customary use of PRRS's ARC system/services. For example, see Exhibit 16, p.1 ("Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website, stating that PRRS provides "ARC Software modules and related documentation" to its customers). Upon information and belief, such software and/or documentation instructs PRRS's customers to perform method(s) that infringe at least claims 12, 13, 14, 16, 18, and 19 of the '172 patent.

297. Upon information and belief, PRRS's encouragement of its customers to use the ARC system/services according to its ordinary and customary usage resulted in PRRS's customers directly infringing claims of the '172 patent, including at least claims 12, 13, 14, 16, 18, and 19.

298. In the alternative, PRRS also has been and is now in violation of 35 U.S.C. § 271(c) by contributing to infringement of claims of the '172 Patent, including at least claims 12, 13, 14, 16, 18, and 19, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this District and elsewhere in the United States, automated parking monitoring and management systems/services, including ARC system/services, with knowledge of the '172 Patent and knowing that such automated parking

monitoring and management systems/services are especially made or especially adapted for use in the infringement of the '172 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

299.    Upon information and belief, LAZ Parking has been and is infringing the '172 Patent, including by knowingly, actively, and intentionally inducing the direct infringement by others of the '172 Patent in the United States, the State of Texas, and this District.

300.    Upon information and belief LAZ Parking has contracted with PRRS to deploy PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, at parking facilities operated by LAZ Parking located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin, Texas as well as at additional locations within the United States.

301.    As alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and have been in use at parking lots operated by LAZ Parking, infringe claims of the '172 patent, including at least claims 12, 13, 14, 16, 18, and 19.  A comparison of claims 12, 13, 14, 16, 18, and 19 of the '172 Patent to PRRS's ARC system/services is attached as Exhibit 11A, which is incorporated herein by reference.

302.    Upon information and belief, LAZ Parking knew of the '172 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

303.    Upon information and belief, LAZ Parking specifically intended and was aware that the ordinary and customary use PRRS's "ARC" system/services at LAZ Parking-operated facilities would infringe the '172 Patent, including at least claims 12, 13, 14, 16, 18, and 19.

304.    Upon information and belief, LAZ Parking additionally took active steps to encourage PRRS to use and operate PRRS's ARC system/services at LAZ Parking's facilities, despite knowing of the '172 Patent, in a manner LAZ Parking knew to directly infringe claims of the '172 Patent, including at least claims 12, 13, 14, 16, 18, and 19.

305.    Upon information and belief LAZ Parking knew that the normal and customary use by PRRS of PRRS's ARC system/services at LAZ Parking-operated lots directly infringed the '172 Patent.

306.    In the alternative, LAZ Parking is liable for direct infringement, including under the theory of joint infringement.

307.    Upon information and belief, automated parking monitoring and management systems/services provided by PRRS to LAZ Parking, including the ARC system/services, require at least that some combination of PRRS, LAZ Parking, and/or others in contract with LAZ Parking use such systems/services and perform all the steps recited by claims of the '172 Patent, including at least claims 12, 13, 14, 16, 18, and 19. Further, upon information and belief, to the extent use of such systems/services involves PRRS itself or another LAZ Parking contractee performing one or more of the claimed steps, all of the claimed steps are nevertheless attributable to LAZ Parking under the theory of joint infringement due to a contractual relationship between LAZ Parking and its contractee(s) that directs the contractee (e.g., PRRS) to perform, and also provides instructions regarding how to perform, the claimed steps that LAZ Parking itself does not perform.

308.    In addition, upon information and belief the contract LAZ Parking entered into with PRRS conditions payment for PRRS's automated parking monitoring and management

systems/services on PRRS's performance of any steps of the contracted-for ARC system/services that LAZ Parking itself does not perform.

309.    Defendants' infringement of the '172 patent is ongoing.

310.    Defendants' infringement of the '172 patent has been and continues to be willful, at least as of the date of each Defendant's knowledge of the '172 patent as alleged above. Defendants have profited from and will continue to profit from their infringing activities. MPS has been and will continue to be damaged by Defendants' infringing activities. As a result, MPS is entitled to injunctive relief and damages adequate to compensate it for such infringement, in accordance with 35 U.S.C. §§ 271, 281, 283, and 284. The harm to MPS from Defendants' ongoing infringing activity is irreparable, is continuing, is not fully compensable by money damages, and will continue unless Defendants' infringing activities are enjoined.

## COUNT 2
## Infringement of U.S. Patent No. 11,257,302

311.    MPS incorporates the paragraphs above as if fully set forth herein.

312.    MPS is the assignee of all right, title and interest in the '302 Patent, a copy of which is attached as Exhibit 2.

313.    Upon information and belief, PRRS has infringed claims of the Patents-in-Suit, directly or indirectly, by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, for and/or at parking facilities of its customers throughout the United States, including parking facilities of customers located in this District.

314.    Upon information and belief, PRRS has directly infringed and continues to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, claims of the '302 Patent by making, using, offering to sell, selling, and/or importing automated

parking monitoring and management systems/services, including but not limited to, using such systems/services at parking facilities located in this District.

315.    Upon information and belief, such infringement includes PRRS's "Automated Recognition and Compliance" ("ARC") system/services. For example, upon information and belief, PRRS deploys its "ARC" system/services at parking facilities of its customers, and in so doing PRRS performs each step of claims 1-6, and 8 of the '302 Patent and therefore infringes at least those claims. A comparison of claims 1-6, and 8 of the '302 Patent to PRRS's ARC system/services is attached as Exhibit 12A, which is incorporated herein by reference.

316.    Upon information and belief, PRRS knew of the '302 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

317.    In the alternative, PRRS is liable for direct infringement under the theory of joint infringement. Upon information and belief, the automated parking monitoring and management systems/services provided by PRRS to its customers (including the ARC system/services) require at least that some combination of PRRS and its customer use such system/services and perform all the steps recited by claims of the '302 patent, including at least claims 1-6, and 8. Further, upon information and belief, to the extent such system/services provided by PRRS involves PRRS's customer performing some of the claimed steps and PRRS itself performing others, all of the claimed steps are nevertheless attributable to PRRS under the theory of joint infringement due to a contractual relationship between PRRS and its customer where PRRS directs its customer to perform the claimed steps that PRRS itself does not perform.

318.    Upon information and belief, PRRS also provides its customers with detailed instructions regarding how to perform the claimed steps, and resources for helping them to do so.

319.    In addition, upon information and belief PRRS contracts with its customers to condition receipt of the benefit of its automated parking monitoring and management systems/services on those customers' performance of any steps of using such systems/services that PRRS itself does not perform, according to terms prescribed by PRRS as part of its contract with the customer.

320.    Upon information and belief PRRS also maintains control over the use by its customers of the systems providing the parking monitoring, including the ARC system/services. For example, the "Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website at https://prrsparking.com/legal.html, states PRRS's customers' "use of the ARC Software will be solely in accordance with the documentation [provided by PRRS], this Agreement, and such reasonable instructions as PRRS may provide from time to time." Exhibit 16, p.1.

321.    Exhibit 16 is a true and correct copy of the "Facility Monitoring and Compliance Agreement Terms and Conditions" that is posted on PRRS's website at https://prrsparking.com/legal.html.

322.    In the alternative, PRRS has been and is indirectly infringing the '302 Patent by actively inducing and/or contributing to the direct infringement by PRRS's customers of the '302 Patent in the United States, the State of Texas, and this District.

323.    Upon information and belief, PRRS knew of the '302 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

324.    Upon information and belief and as alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that

are and/or have been in use at parking lots operated by PRRS customers, infringe claims of the '302 patent, including claims 1-6, and 8. A comparison of claims 1-6, and 8of the '302 Patent to PRRS's ARC system/services is attached as Exhibit 12A, which is incorporated herein by reference.

325.    In the alternative, upon information and belief, PRRS has been and is now has been and is now in violation of 35 U.S.C. § 271(b) by knowingly and intentionally inducing infringement of claims of the '302 Patent, including at least claims 1-6, and 8. Upon information and belief, PRRS specifically intended and was aware that the ordinary and customary use of its automated parking monitoring and management systems/services, including the ARC system/services, by its customers would infringe the '302 Patent.

326.    Upon information and belief, PRRS took active steps to encourage its customers to use and operate PRRS's automated parking monitoring and management systems/services at parking facilities of PRRS customers, despite knowing of the '302 Patent, in a manner PRRS knew to directly infringe claims of the '302 Patent, including at least claims 1-6, and 8. Further, upon information and belief PRRS provides product and/or service manuals and other technical information that cause its customers and/or other third parties to use and to operate the ARC system, for its ordinary and customary use, such that PRRS's customers and/or other third parties have directly infringed the '302 Patent, through the normal and customary use of PRRS's ARC system/services. For example, see Exhibit 16, p.1 ("Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website, stating that PRRS provides "ARC Software modules and related documentation" to its customers). Upon information and belief, such software and/or documentation instructs PRRS's customers to perform method(s) that infringe at least claims 1-6, and 8 of the '302 patent.

327.    Upon information and belief, PRRS's encouragement of its customers to use the ARC system/services according to its ordinary and customary usage resulted in PRRS's customers directly infringing claims of the '302 patent, including at least claims 1-6, and 8.

328.    In the alternative, PRRS also has been and is now in violation of 35 U.S.C. § 271(c) by contributing to infringement of claims of the '302 Patent, including at least claims 1-6, and 8, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this District and elsewhere in the United States, automated parking monitoring and management systems/services, including ARC system/services, with knowledge of the '302 Patent and knowing that such automated parking monitoring and management systems/services are especially made or especially adapted for use in the infringement of the '302 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

329.    Upon information and belief, LAZ Parking has been and is infringing the '302 Patent, including by knowingly, actively, and intentionally inducing the direct infringement by others of the '302 Patent in the United States, the State of Texas, and this District.

330.    Upon information and belief LAZ Parking has contracted with PRRS to deploy PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, at parking facilities operated by LAZ Parking located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin, Texas as well as at additional locations within the United States.

331.    As alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and have been in use at parking lots operated by LAZ Parking, infringe claims of the '302 patent, including at least

claims 1-6, and 8.  A comparison of claims 1-6, and 8 of the '302 Patent to PRRS's ARC

system/services is attached as Exhibit 12A, which is incorporated herein by reference.

332.    Upon information and belief, LAZ Parking knew of the '302 patent prior to the

filing of the Complaint as alleged above, and in any event no later than the date of filing of this

Complaint.

333.    Upon information and belief, LAZ Parking specifically intended and was aware

that the ordinary and customary use PRRS's "ARC" system/services at LAZ Parking-operated

facilities would infringe the '302 Patent, including at least claims 1-6, and 8.

334.    Upon information and belief, LAZ Parking additionally took active steps to

encourage PRRS to use and operate PRRS's ARC system/services at LAZ Parking's facilities,

despite knowing of the '302 Patent, in a manner LAZ Parking knew to directly infringe claims of

the '302 Patent, including at least claims 1-6, and 8.

335.    Upon information and belief LAZ Parking knew that the normal and customary

use by PRRS of PRRS's ARC system/services at LAZ Parking-operated lots directly infringed

the '302 Patent.

336.    In the alternative, LAZ Parking is liable for direct infringement, including under

the theory of joint infringement.

337.    Upon information and belief, automated parking monitoring and management

systems/services provided by PRRS to LAZ Parking, including the ARC system/services, require

at least that some combination of PRRS, LAZ Parking, and/or others in contract with LAZ

Parking use such systems/services and perform all the steps recited by claims of the '302 Patent,

including at least claims 1-6, and 8. Further, upon information and belief, to the extent use of

such systems/services involves PRRS itself or another LAZ Parking contractee performing one

or more of the claimed steps, all of the claimed steps are nevertheless attributable to LAZ Parking under the theory of joint infringement due to a contractual relationship between LAZ Parking and its contractee(s) that directs the contractee (e.g., PRRS) to perform, and also provides instructions regarding how to perform, the claimed steps that LAZ Parking itself does not perform.

338.    In addition, upon information and belief the contract LAZ Parking entered into with PRRS conditions payment for PRRS's automated parking monitoring and management systems/services on PRRS's performance of any steps of the contracted-for ARC system/services that LAZ Parking itself does not perform.

339.    Defendants' infringement of the '302 patent is ongoing.

340.    Defendants' infringement of the '302 patent has been and continues to be willful, at least as of the date of each Defendant's knowledge of the '302 patent as alleged above. Defendants have profited from and will continue to profit from their infringing activities. MPS has been and will continue to be damaged by Defendants' infringing activities. As a result, MPS is entitled to injunctive relief and damages adequate to compensate it for such infringement, in accordance with 35 U.S.C. §§ 271, 281, 283, and 284. The harm to MPS from Defendants' ongoing infringing activity is irreparable, is continuing, is not fully compensable by money damages, and will continue unless Defendants' infringing activities are enjoined.

**COUNT 3**
**Infringement of U.S. Patent No. 11,688,205**

341.    MPS incorporates the paragraphs above as if fully set forth herein.

342.    MPS is the assignee of all right, title and interest in the '205 Patent, a copy of which is attached as Exhibit 3.

343.    Upon information and belief, PRRS has infringed claims of the Patents-in-Suit, directly or indirectly, by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, for and/or at parking facilities of its customers throughout the United States, including parking facilities of customers located in this District.

344.    Upon information and belief, PRRS has directly infringed and continues to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, claims of the '205 Patent by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including but not limited to, using such systems/services at parking facilities located in this District.

345.    Upon information and belief, such infringement includes PRRS's "Automated Recognition and Compliance" ("ARC") system/services. For example, upon information and belief, PRRS deploys its "ARC" system/services at parking facilities of its customers, and in so doing PRRS performs each step of claims 16-18 of the '205 Patent and therefore infringes at least those claims. A comparison of claims 16-18 of the '205 Patent to PRRS's ARC system/services is attached as Exhibit 13A, which is incorporated herein by reference.

346.    Upon information and belief, PRRS knew of the '205 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

347.    In the alternative, PRRS is liable for direct infringement under the theory of joint infringement. Upon information and belief, the automated parking monitoring and management systems/services provided by PRRS to its customers (including the ARC system/services) require at least that some combination of PRRS and its customer use such system/services and

perform all the steps recited by claims of the '205 patent, including at least claims 16-18. Further, upon information and belief, to the extent such system/services provided by PRRS involves PRRS's customer performing some of the claimed steps and PRRS itself performing others, all of the claimed steps are nevertheless attributable to PRRS under the theory of joint infringement due to a contractual relationship between PRRS and its customer where PRRS directs its customer to perform the claimed steps that PRRS itself does not perform.

348. Upon information and belief, PRRS also provides its customers with detailed instructions regarding how to perform the claimed steps, and resources for helping them to do so.

349. In addition, upon information and belief PRRS contracts with its customers to condition receipt of the benefit of its automated parking monitoring and management systems/services on those customers' performance of any steps of using such systems/services that PRRS itself does not perform, according to terms prescribed by PRRS as part of its contract with the customer.

350. Upon information and belief PRRS also maintains control over the use by its customers of the systems providing the parking monitoring, including the ARC system/services. For example, the "Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website at https://prrsparking.com/legal.html, states PRRS's customers' "use of the ARC Software will be solely in accordance with the documentation [provided by PRRS], this Agreement, and such reasonable instructions as PRRS may provide from time to time." Exhibit 16, p.1.

351. Exhibit 16 is a true and correct copy of the "Facility Monitoring and Compliance Agreement Terms and Conditions" that is posted on PRRS's website at https://prrsparking.com/legal.html.

352.    In the alternative, PRRS has been and is indirectly infringing the '205 Patent by actively inducing and/or contributing to the direct infringement by PRRS's customers of the '205 Patent in the United States, the State of Texas, and this District.

353.    Upon information and belief, PRRS knew of the '205 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

354.    Upon information and belief and as alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and/or have been in use at parking lots operated by PRRS customers, infringe claims of the '205 patent, including claims 16-18.  A comparison of claims 16-18  of the '205 Patent to PRRS's ARC system/services is attached as Exhibit 13A, which is incorporated herein by reference.

355.    In the alternative, upon information and belief, PRRS has been and is now has been and is now in violation of 35 U.S.C. § 271(b) by knowingly and intentionally inducing infringement of claims of the '205 Patent, including at least claims 16-18. Upon information and belief, PRRS specifically intended and was aware that the ordinary and customary use of its automated parking monitoring and management systems/services, including the ARC system/services, by its customers would infringe the '205 Patent.

356.    Upon information and belief, PRRS took active steps to encourage its customers to use and operate PRRS's automated parking monitoring and management systems/services at parking facilities of PRRS customers, despite knowing of the '205 Patent, in a manner PRRS knew to directly infringe claims of the '205 Patent, including at least claims 16-18. Further, upon information and belief PRRS provides product and/or service manuals and other technical

information that cause its customers and/or other third parties to use and to operate the ARC system, for its ordinary and customary use, such that PRRS's customers and/or other third parties have directly infringed the '205 Patent, through the normal and customary use of PRRS's ARC system/services. For example, see Exhibit 16, p.1 ("Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website, stating that PRRS provides "ARC Software modules and related documentation" to its customers). Upon information and belief, such software and/or documentation instructs PRRS's customers to perform method(s) that infringe at least claims 16-18 of the '205 patent.

357.    Upon information and belief, PRRS's encouragement of its customers to use the ARC system/services according to its ordinary and customary usage resulted in PRRS's customers directly infringing claims of the '205 patent, including at least claims 16-18.

358.    In the alternative, PRRS also has been and is now in violation of 35 U.S.C. § 271(c) by contributing to infringement of claims of the '205 Patent, including at least claims 16-18, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this District and elsewhere in the United States, automated parking monitoring and management systems/services, including ARC system/services, with knowledge of the '205 Patent and knowing that such automated parking monitoring and management systems/services are especially made or especially adapted for use in the infringement of the '205 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

359.    Upon information and belief, LAZ Parking has been and is infringing the '205 Patent, including by knowingly, actively, and intentionally inducing the direct infringement by others of the '205 Patent in the United States, the State of Texas, and this District.

360.     Upon information and belief LAZ Parking has contracted with PRRS to deploy PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, at parking facilities operated by LAZ Parking located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin, Texas as well as at additional locations within the United States.

361.     As alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and have been in use at parking lots operated by LAZ Parking, infringe claims of the '205 patent, including at least claims 16-18.  A comparison of claims 16-18 of the '205 Patent to PRRS's ARC system/services is attached as Exhibit 13A, which is incorporated herein by reference.

362.     Upon information and belief, LAZ Parking knew of the '205 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

363.     Upon information and belief, LAZ Parking specifically intended and was aware that the ordinary and customary use PRRS's "ARC" system/services at LAZ Parking-operated facilities would infringe the '205 Patent, including at least claims 16-18.

364.     Upon information and belief, LAZ Parking additionally took active steps to encourage PRRS to use and operate PRRS's ARC system/services at LAZ Parking's facilities, despite knowing of the '205 Patent, in a manner LAZ Parking knew to directly infringe claims of the '205 Patent, including at least claims 16-18.

365.     Upon information and belief LAZ Parking knew that the normal and customary use by PRRS of PRRS's ARC system/services at LAZ Parking-operated lots directly infringed the '205 Patent.

366.    In the alternative, LAZ Parking is liable for direct infringement, including under the theory of joint infringement.

367.    Upon information and belief, automated parking monitoring and management systems/services provided by PRRS to LAZ Parking, including the ARC system/services, require at least that some combination of PRRS, LAZ Parking, and/or others in contract with LAZ Parking use such systems/services and perform all the steps recited by claims of the '205 Patent, including at least claims 16-18. Further, upon information and belief, to the extent use of such systems/services involves PRRS itself or another LAZ Parking contractee performing one or more of the claimed steps, all of the claimed steps are nevertheless attributable to LAZ Parking under the theory of joint infringement due to a contractual relationship between LAZ Parking and its contractee(s) that directs the contractee (e.g., PRRS) to perform, and also provides instructions regarding how to perform, the claimed steps that LAZ Parking itself does not perform.

368.    In addition, upon information and belief the contract LAZ Parking entered into with PRRS conditions payment for PRRS's automated parking monitoring and management systems/services on PRRS's performance of any steps of the contracted-for ARC system/services that LAZ Parking itself does not perform.

369.    Defendants' infringement of the '205 patent is ongoing.

370.    Defendants' infringement of the '205 patent has been and continues to be willful, at least as of the date of each Defendant's knowledge of the '205 patent as alleged above. Defendants have profited from and will continue to profit from their infringing activities. MPS has been and will continue to be damaged by Defendants' infringing activities. As a result, MPS is entitled to injunctive relief and damages adequate to compensate it for such infringement, in

accordance with 35 U.S.C. §§ 271, 281, 283, and 284. The harm to MPS from Defendants' ongoing infringing activity is irreparable, is continuing, is not fully compensable by money damages, and will continue unless Defendants' infringing activities are enjoined.

**COUNT 4**
**Infringement of U.S. Patent No. 12,142,085**

371.    MPS incorporates the paragraphs above as if fully set forth herein.

372.    MPS is the assignee of all right, title and interest in the '085 Patent, a copy of which is attached as Exhibit 4.

373.    Upon information and belief, PRRS has infringed claims of the Patents-in-Suit, directly or indirectly, by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, for and/or at parking facilities of its customers throughout the United States, including parking facilities of customers located in this District.

374.    Upon information and belief, PRRS has directly infringed and continues to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, claims of the '085 Patent by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including but not limited to, using such systems/services at parking facilities located in this District.

375.    Upon information and belief, such infringement includes PRRS's "Automated Recognition and Compliance" ("ARC") system/services. For example, upon information and belief, PRRS deploys its "ARC" system/services at parking facilities of its customers, and in so doing PRRS performs each step of claims 1-5, and 13-20 of the '085 Patent and therefore infringes at least those claims. A comparison of claims 1-5, and 13-20 of the '085 Patent to PRRS's ARC system/services is attached as Exhibit 14A, which is incorporated herein by

reference.

376.    Upon information and belief, PRRS knew of the '085 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

377.    In the alternative, PRRS is liable for direct infringement under the theory of joint infringement. Upon information and belief, the automated parking monitoring and management systems/services provided by PRRS to its customers (including the ARC system/services) require at least that some combination of PRRS and its customer use such system/services and perform all the steps recited by claims of the '085 patent, including at least claims 1-5, and 13-20. Further, upon information and belief, to the extent such system/services provided by PRRS involves PRRS's customer performing some of the claimed steps and PRRS itself performing others, all of the claimed steps are nevertheless attributable to PRRS under the theory of joint infringement due to a contractual relationship between PRRS and its customer where PRRS directs its customer to perform the claimed steps that PRRS itself does not perform.

378.    Upon information and belief, PRRS also provides its customers with detailed instructions regarding how to perform the claimed steps, and resources for helping them to do so.

379.    In addition, upon information and belief PRRS contracts with its customers to condition receipt of the benefit of its automated parking monitoring and management systems/services on those customers' performance of any steps of using such systems/services that PRRS itself does not perform, according to terms prescribed by PRRS as part of its contract with the customer.

380.    Upon information and belief PRRS also maintains control over the use by its customers of the systems providing the parking monitoring, including the ARC system/services.

For example, the "Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website at https://prrsparking.com/legal.html, states PRRS's customers' "use of the ARC Software will be solely in accordance with the documentation [provided by PRRS], this Agreement, and such reasonable instructions as PRRS may provide from time to time." Exhibit 16, p.1.

381.    Exhibit 16 is a true and correct copy of the "Facility Monitoring and Compliance Agreement Terms and Conditions" that is posted on PRRS's website at https://prrsparking.com/legal.html.

382.    In the alternative, PRRS has been and is indirectly infringing the '085 Patent by actively inducing and/or contributing to the direct infringement by PRRS's customers of the '085 Patent in the United States, the State of Texas, and this District.

383.    Upon information and belief, PRRS knew of the '085 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

384.    Upon information and belief and as alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and/or have been in use at parking lots operated by PRRS customers, infringe claims of the '085 patent, including claims 1-5, and 13-20.  A comparison of claims 1-5, and 13-20 of the '085 Patent to PRRS's ARC system/services is attached as Exhibit 14A, which is incorporated herein by reference.

385.    In the alternative, upon information and belief, PRRS has been and is now has been and is now in violation of 35 U.S.C. § 271(b) by knowingly and intentionally inducing infringement of claims of the '085 Patent, including at least claims 1-5, and 13-20. Upon

information and belief, PRRS specifically intended and was aware that the ordinary and customary use of its automated parking monitoring and management systems/services, including the ARC system/services, by its customers would infringe the '085 Patent.

386.    Upon information and belief, PRRS took active steps to encourage its customers to use and operate PRRS's automated parking monitoring and management systems/services at parking facilities of PRRS customers, despite knowing of the '085 Patent, in a manner PRRS knew to directly infringe claims of the '085 Patent, including at least claims 1-5, and 13-20. Further, upon information and belief PRRS provides product and/or service manuals and other technical information that cause its customers and/or other third parties to use and to operate the ARC system, for its ordinary and customary use, such that PRRS's customers and/or other third parties have directly infringed the '085 Patent, through the normal and customary use of PRRS's ARC system/services. For example, see Exhibit 16, p.1 ("Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website, stating that PRRS provides "ARC Software modules and related documentation" to its customers). Upon information and belief, such software and/or documentation instructs PRRS's customers to perform method(s) that infringe at least claims 1-5, and 13-20 of the '085 patent.

387.    Upon information and belief, PRRS's encouragement of its customers to use the ARC system/services according to its ordinary and customary usage resulted in PRRS's customers directly infringing claims of the '085 patent, including at least claims 1-5, and 13-20.

388.    In the alternative, PRRS also has been and is now in violation of 35 U.S.C. § 271(c) by contributing to infringement of claims of the '085 Patent, including at least claims 1-5, and 13-20, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this District and elsewhere in the United States,

automated parking monitoring and management systems/services, including ARC system/services, with knowledge of the '085 Patent and knowing that such automated parking monitoring and management systems/services are especially made or especially adapted for use in the infringement of the '085 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

389.    Upon information and belief, LAZ Parking has been and is infringing the '085 Patent, including by knowingly, actively, and intentionally inducing the direct infringement by others of the '085 Patent in the United States, the State of Texas, and this District.

390.    Upon information and belief LAZ Parking has contracted with PRRS to deploy PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, at parking facilities operated by LAZ Parking located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin, Texas as well as at additional locations within the United States.

391.    As alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and have been in use at parking lots operated by LAZ Parking, infringe claims of the '085 patent, including at least claims 1-5, and 13-20.  A comparison of claims 1-5, and 13-20 of the '085 Patent to PRRS's ARC system/services is attached as Exhibit 14A, which is incorporated herein by reference.

392.    Upon information and belief, LAZ Parking knew of the '085 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

393.    Upon information and belief, LAZ Parking specifically intended and was aware that the ordinary and customary use PRRS's "ARC" system/services at LAZ Parking-operated facilities would infringe the '085 Patent, including at least claims 1-5, and 13-20.

394.    Upon information and belief, LAZ Parking additionally took active steps to encourage PRRS to use and operate PRRS's ARC system/services at LAZ Parking's facilities, despite knowing of the '085 Patent, in a manner LAZ Parking knew to directly infringe claims of the '085 Patent, including at least claims 1-5, and 13-20.

395.    Upon information and belief LAZ Parking knew that the normal and customary use by PRRS of PRRS's ARC system/services at LAZ Parking-operated lots directly infringed the '085 Patent.

396.    In the alternative, LAZ Parking is liable for direct infringement, including under the theory of joint infringement.

397.    Upon information and belief, automated parking monitoring and management systems/services provided by PRRS to LAZ Parking, including the ARC system/services, require at least that some combination of PRRS, LAZ Parking, and/or others in contract with LAZ Parking use such systems/services and perform all the steps recited by claims of the '085 Patent, including at least claims 1-5, and 13-20. Further, upon information and belief, to the extent use of such systems/services involves PRRS itself or another LAZ Parking contractee performing one or more of the claimed steps, all of the claimed steps are nevertheless attributable to LAZ Parking under the theory of joint infringement due to a contractual relationship between LAZ Parking and its contractee(s) that directs the contractee (e.g., PRRS) to perform, and also provides instructions regarding how to perform, the claimed steps that LAZ Parking itself does not perform.

398.    In addition, upon information and belief the contract LAZ Parking entered into with PRRS conditions payment for PRRS's automated parking monitoring and management systems/services on PRRS's performance of any steps of the contracted-for ARC system/services that LAZ Parking itself does not perform.

399.    Defendants' infringement of the '085 patent is ongoing.

400.    Defendants' infringement of the '085 patent has been and continues to be willful, at least as of the date of each Defendant's knowledge of the '085 patent as alleged above. Defendants have profited from and will continue to profit from their infringing activities. MPS has been and will continue to be damaged by Defendants' infringing activities. As a result, MPS is entitled to injunctive relief and damages adequate to compensate it for such infringement, in accordance with 35 U.S.C. §§ 271, 281, 283, and 284. The harm to MPS from Defendants' ongoing infringing activity is irreparable, is continuing, is not fully compensable by money damages, and will continue unless Defendants' infringing activities are enjoined.

## COUNT 5
## Infringement of U.S. Patent No. 12,249,187

401.    MPS incorporates the paragraphs above as if fully set forth herein.

402.    MPS is the assignee of all right, title and interest in the '187 Patent, a copy of which is attached as Exhibit 5.

403.    Upon information and belief, PRRS has infringed claims of the Patents-in-Suit, directly or indirectly, by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, for and/or at parking facilities of its customers throughout the United States, including parking facilities of customers located in this District.

404.     Upon information and belief, PRRS has directly infringed and continues to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, claims of the '187 Patent by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including but not limited to, using such systems/services at parking facilities located in this District.

405.     Upon information and belief, such infringement includes PRRS's "Automated Recognition and Compliance" ("ARC") system/services. For example, upon information and belief, PRRS deploys its "ARC" system/services at parking facilities of its customers, and in so doing PRRS performs each step of claims 1-5, and 9-12 of the '187 Patent and therefore infringes at least those claims. A comparison of claims 1-5, and 9-12 of the '187 Patent to PRRS's ARC system/services is attached as Exhibit 15A, which is incorporated herein by reference.

406.     Upon information and belief, PRRS knew of the '187 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

407.     In the alternative, PRRS is liable for direct infringement under the theory of joint infringement. Upon information and belief, the automated parking monitoring and management systems/services provided by PRRS to its customers (including the ARC system/services) require at least that some combination of PRRS and its customer use such system/services and perform all the steps recited by claims of the '187 patent, including at least claims 1-5, and 9-12. Further, upon information and belief, to the extent such system/services provided by PRRS involves PRRS's customer performing some of the claimed steps and PRRS itself performing others, all of the claimed steps are nevertheless attributable to PRRS under the theory of joint

infringement due to a contractual relationship between PRRS and its customer where PRRS directs its customer to perform the claimed steps that PRRS itself does not perform.

408.     Upon information and belief, PRRS also provides its customers with detailed instructions regarding how to perform the claimed steps, and resources for helping them to do so.

409.     In addition, upon information and belief PRRS contracts with its customers to condition receipt of the benefit of its automated parking monitoring and management systems/services on those customers' performance of any steps of using such systems/services that PRRS itself does not perform, according to terms prescribed by PRRS as part of its contract with the customer.

410.     Upon information and belief PRRS also maintains control over the use by its customers of the systems providing the parking monitoring, including the ARC system/services. For example, the "Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website at https://prrsparking.com/legal.html, states PRRS's customers' "use of the ARC Software will be solely in accordance with the documentation [provided by PRRS], this Agreement, and such reasonable instructions as PRRS may provide from time to time." Exhibit 16, p.1.

411.     Exhibit 16 is a true and correct copy of the "Facility Monitoring and Compliance Agreement Terms and Conditions" that is posted on PRRS's website at https://prrsparking.com/legal.html.

412.     In the alternative, PRRS has been and is indirectly infringing the '187 Patent by actively inducing and/or contributing to the direct infringement by PRRS's customers of the '187 Patent in the United States, the State of Texas, and this District.

413.    Upon information and belief, PRRS knew of the '187 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

414.    Upon information and belief and as alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and/or have been in use at parking lots operated by PRRS customers, infringe claims of the '187 patent, including claims 1-5, and 9-12. A comparison of claims 1-5, and 9-12 of the '187 Patent to PRRS's ARC system/services is attached as Exhibit 15A, which is incorporated herein by reference.

415.    In the alternative, upon information and belief, PRRS has been and is now has been and is now in violation of 35 U.S.C. § 271(b) by knowingly and intentionally inducing infringement of claims of the '187 Patent, including at least claims 1-5, and 9-12. Upon information and belief, PRRS specifically intended and was aware that the ordinary and customary use of its automated parking monitoring and management systems/services, including the ARC system/services, by its customers would infringe the '187 Patent.

416.    Upon information and belief, PRRS took active steps to encourage its customers to use and operate PRRS's automated parking monitoring and management systems/services at parking facilities of PRRS customers, despite knowing of the '187 Patent, in a manner PRRS knew to directly infringe claims of the '187 Patent, including at least claims 1-5, and 9-12. Further, upon information and belief PRRS provides product and/or service manuals and other technical information that cause its customers and/or other third parties to use and to operate the ARC system, for its ordinary and customary use, such that PRRS's customers and/or other third parties have directly infringed the '187 Patent, through the normal and customary use of PRRS's

ARC system/services. For example, see Exhibit 16, p.1 ("Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS' website, stating that PRRS provides "ARC Software modules and related documentation" to its customers). Upon information and belief, such software and/or documentation instructs PRRS's customers to perform method(s) that infringe at least claims 1-5, and 9-12 of the '187 patent.

417.    Upon information and belief, PRRS's encouragement of its customers to use the ARC system/services according to its ordinary and customary usage resulted in PRRS's customers directly infringing claims of the '187 patent, including at least claims 1-5, and 9-12.

418.    In the alternative, PRRS also has been and is now in violation of 35 U.S.C. § 271(c) by contributing to infringement of claims of the '187 Patent, including at least claims 1-5, and 9-12, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this District and elsewhere in the United States, automated parking monitoring and management systems/services, including ARC system/services, with knowledge of the '187 Patent and knowing that such automated parking monitoring and management systems/services are especially made or especially adapted for use in the infringement of the '187 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

419.    Upon information and belief, LAZ Parking has been and is infringing the '187 Patent, including by knowingly, actively, and intentionally inducing the direct infringement by others of the '187 Patent in the United States, the State of Texas, and this District.

420.    Upon information and belief LAZ Parking has contracted with PRRS to deploy PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, at parking facilities operated by LAZ Parking located at 510 Guadalupe

Street, 108 W. Gibson, 305 S. Congress Avenue, 400 E 8th Street, 415 E 7th Street, and 99 Trinity Street in Austin, Texas as well as at additional locations within the United States.

421.    As alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and have been in use at parking lots operated by LAZ Parking, infringe claims of the '187 patent, including at least claims 1-5, and 9-12.  A comparison of claims 1-5, and 9-12 of the '187 Patent to PRRS's ARC system/services is attached as Exhibit 15A, which is incorporated herein by reference.

422.    Upon information and belief, LAZ Parking knew of the '187 patent prior to the filing of the Complaint as alleged above, and in any event no later than the date of filing of this Complaint.

423.    Upon information and belief, LAZ Parking specifically intended and was aware that the ordinary and customary use PRRS's "ARC" system/services at LAZ Parking-operated facilities would infringe the '187 Patent, including at least claims 1-5, and 9-12.

424.    Upon information and belief, LAZ Parking additionally took active steps to encourage PRRS to use and operate PRRS's ARC system/services at LAZ Parking's facilities, despite knowing of the '187 Patent, in a manner LAZ Parking knew to directly infringe claims of the '187 Patent, including at least claims 1-5, and 9-12.

425.    Upon information and belief LAZ Parking knew that the normal and customary use by PRRS of PRRS's ARC system/services at LAZ Parking-operated lots directly infringed the '187 Patent.

426.    In the alternative, LAZ Parking is liable for direct infringement, including under the theory of joint infringement.

427. Upon information and belief, automated parking monitoring and management systems/services provided by PRRS to LAZ Parking, including the ARC system/services, require at least that some combination of PRRS, LAZ Parking, and/or others in contract with LAZ Parking use such systems/services and perform all the steps recited by claims of the '187 Patent, including at least claims 1-5, and 9-12. Further, upon information and belief, to the extent use of such systems/services involves PRRS itself or another LAZ Parking contractee performing one or more of the claimed steps, all of the claimed steps are nevertheless attributable to LAZ Parking under the theory of joint infringement due to a contractual relationship between LAZ Parking and its contractee(s) that directs the contractee (e.g., PRRS) to perform, and also provides instructions regarding how to perform, the claimed steps that LAZ Parking itself does not perform.

428. In addition, upon information and belief the contract LAZ Parking entered into with PRRS conditions payment for PRRS's automated parking monitoring and management systems/services on PRRS's performance of any steps of the contracted-for ARC system/services that LAZ Parking itself does not perform.

429. Defendants' infringement of the '187 patent is ongoing.

430. Defendants' infringement of the '187 patent has been and continues to be willful, at least as of the date of each Defendant's knowledge of the '187 patent as alleged above. Defendants have profited from and will continue to profit from their infringing activities. MPS has been and will continue to be damaged by Defendants' infringing activities. As a result, MPS is entitled to injunctive relief and damages adequate to compensate it for such infringement, in

accordance with 35 U.S.C. §§ 271, 281, 283, and 284. The harm to MPS from Defendants' ongoing infringing activity is irreparable, is continuing, is not fully compensable by money damages, and will continue unless Defendants' infringing activities are enjoined.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff MPS requests that this Court grant the following relief:

A.      A judgment that Defendants have infringed each of the Patents-in-Suit;

B.      An order restraining and enjoining Defendants, their officers, agents, attorneys and employees, and those acting in privity or concert with Defendants, from further infringing the Patents-in-Suit;

C.      A judgment and order requiring Defendants to pay all appropriate damages under 35 U.S.C. § 284, including prejudgment and post-judgment interest and including damages arising from Defendants' past and continuing infringement up until the date Defendants are finally and permanently enjoined from further infringement;

D.      A determination that Defendants' infringement of the Patents-in-Suit has been willful and an award of treble damages to MPS pursuant to 35 U.S.C. § 284;

E.      A judgment and order requiring Defendants to pay MPS's attorney's fees incurred in connection with this lawsuit, if this case is found to be exceptional as provided by 35 U.S.C. § 285;

F.      An order awarding MPS costs and expenses in this action; and

G.      Such other and further relief as the Court may deem just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff MPS demands a trial by jury on all issues that are so triable.

Dated: August 13, 2025                Respectfully submitted,

                                      /s/ *Peter M. Kohlhepp*
                                      Deron R. Dacus
                                      State Bar No. 00790553
                                      The Dacus Firm, P.C.
                                      821 ESE Loop 323, Suite 430
                                      Tyler, TX 75701
                                      Phone/Fax:  903-705-1117
                                      ddacus@dacusfirm.com

                                      Philip P. Caspers (*Pro Hac Vice*)
                                      Samuel A. Hamer (*Pro Hac Vice*)
                                      Peter M. Kohlhepp (*Pro Hac Vice*)
                                      Carlson, Caspers, Vandenburgh
                                        & Lindquist P.A.
                                      225 South Sixth Street, Suite 4200
                                      Minneapolis, MN 55402
                                      Phone:  (612) 436-9659
                                      Facsimile: (612) 436-9605
                                      pcaspers@carlsoncaspers.com
                                      shamer@carlsoncaspers.com
                                      pkohlhepp@carlsoncaspers.com

                                      *Attorneys for Plaintiff Municipal Parking*
                                      *Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the *Amended Complaint and Exhibits* were served

on August 13, 2025 to all opposing counsel of record as indicated below:

| | |
|---|---|
| ***Via the Court's ECF System:*** | ***Via Electronic Mail by Agreement:*** |
| Trent D. Stephens<br>FisherBroyles, LLP<br>2925 Richmond Ave., Ste. 1200<br>Houston, TX 77098 | William Rocha<br>WRocha@lazparking.com |
| Ian R. Walsworth<br>Adam Yowell<br>Patricia Y. Ho<br>FisherBroyles, LLP<br>999 18th Street, Suite 3000<br>Denver, CO  80202 | *Counsel for Defendants LAZ Karp Associates LLC. and LAZ Parking Texas, LLC.* |
| *Counsel for Defendant Parking Revenue Recovery Services Inc.* | |

/s/ *Peter M. Kohlhepp*
Peter M. Kohlhepp